# In the United States Court of Federal Claims

**No. 20-1061L**
**Filed: August 27, 2021**

```
* * * * * * * * * * * * * * * * * * *
                                      *
 FISHERMEN'S FINEST, INC., et al.,    *
                                      *
            Plaintiffs,               *
                                      *
 v.                                   *
                                      *
 UNITED STATES,                       *
                                      *
            Defendant.                *
                                      *
 * * * * * * * * * * * * * * * * * * *
```

    **Linda Larson**, Nossaman LLP, Seattle, WA, for plaintiffs. With her was **Svend Brandt-Erichsen**, Nossaman, LLP, Seattle, WA, and **Brian Ferrasci-O'Malley**, Nossaman LLP, Seattle, WA.

    **Borislav Kushnir**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him was **Elizabeth M. Hosford**, Assistant Director, Commercial Litigation Branch, Civil Division, **Martin F. Hockey, Jr.**, Acting Director, Commercial Litigation Branch, and **Brian M. Boynton**, Acting Assistant Attorney General, Civil Division. Of counsel were **Josh Fortenbery**, Attorney-Advisor, Office of General Counsel, National Oceanic and Atmospheric Administration, **Demian A. Schane**, Chief, Alaska Section, Office of General Counsel, National Oceanic and Atmospheric Administration, and **Lt. Michelle E. Walsh**, Staff Attorney, Office of Claims and Litigation, United States Coast Guard.

## O P I N I O N

**HORN, J.**

## FINDINGS OF FACT

    The above-captioned Fifth Amendment takings case arises out of the fishing restrictions placed only upon plaintiffs Fishermen's Finest, Inc., and its subsidiaries (collectively, FFI), pursuant to section 836 of the Frank LoBiondo Coast Guard Authorization Act of 2018, Pub. L. No. 115–282, 132 Stat. 4192, 4320–21 (2018) (Coast Guard Act). As explained in the amended complaint:

Fishermen's Finest, Inc. owns **Fishermen's Finest Holdings, LLC**, a Washington limited liability company ("LLC") which wholly owns three subsidiaries, each of which owns a fishing vessel:

> a. **America's Finest Fishing, LLC,** a Washington LLC, owns the 264-foot *America's Finest*, which operates with a crew of 50;
>
> b. **U.S. Fishing, LLC,** a Washington LLC, owns the 180-foot *U.S. Intrepid*, which operates with a crew of 42; and
>
> c. **North Pacific Fishing, Inc**., a Washington corporation, owns the 164-foot *American No. 1*, which operates with a crew of 40.

(capitalization and emphasis in original). FFI's vessels have been designated as "catcher-processor" vessels, operating in the commercial fishing industry in areas of the Exclusive Economic Zone (EEZ), specifically in the Gulf of Alaska (GOA) and the Bering Sea/Aleutian Islands (BSAI). Plaintiffs state:

> FFI vessels have participated in North Pacific groundfish fisheries since 1967. *American No. 1* was the first groundfish catcher-processor built in the Pacific Northwest, in 1979. Its owners, Helena Park and the late Rudy Petersen, were among a handful of pioneers during the mid to late 1980s of the Americanization of several groundfish fisheries that previously had been caught and processed largely by foreign fleets, as there was no domestic market. FFI has continually invested in vessels and equipment uniquely suited to operate in the remote and challenging North Pacific environment, and currently employs over 200 people.

Plaintiffs state that each of its vessels "is a United States-flagged ship that uses large trawl nets to harvest groundfish species such as flounder, cod, sole and rockfish."

<u>Statutory and Regulatory Framework Under The Magnuson-Stevens Fishery Conservation and Management Act of 1976</u>

"Fisheries,"[1] or stocks of fish, in the North Pacific of the United States, and, specifically in this case, the GOA and BSAI areas of the EEZ, are subject to numerous

---

[1] The Magnuson-Stevens Act defines the term "fishery" as:

> (A) one or more stocks of fish which can be treated as a unit for purposes of conservation and management and which are identified on the basis of geographical, scientific, technical, recreational, and economic characteristics; and

federal regulations arising primarily out of the Magnuson-Stevens Fishery Conservation and Management Act of 1976, Pub. L. No. 94–265, 90 Stat. 331 (1976) (codified as amended at 16 U.S.C. §§ 1801–1883 (2018) (Magnuson-Stevens Act), and other federal laws, also discussed below. In 1976, Congress recognized (1) that fish, including those "off the coasts of the United States . . . constitute valuable and renewable natural resources" that "contribute to the food supply, economy, and health of the Nation and provide recreational opportunities," and (2) that due to overfishing, "[c]ertain stocks of fish have declined to the point where their survival is threatened, and other stocks of fish have been so substantially reduced in number that they could become similarly threatened." See 16 U.S.C. § 1801(a)(1), (2). Congress, therefore, passed the Magnuson-Stevens Act to, among other purposes, "take immediate action to conserve and manage the fishery resources found off the coasts of the United States." See id. § 1801(b)(1). As explained by the United States Court of Appeals for the Federal Circuit in American Pelagic Fishing Co. v. United States, 379 F.3d 1363, 1372 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1139 (2005):

> Subsequently, in a presidential proclamation, President Reagan established the EEZ [Exclusive Economic Zone] and assumed sovereign rights for the United States over this two-hundred-mile zone. Quoting from UNCLOS, Dec. 10, 1982, art. 56 ¶ 1, 21 I.L.M. 1245, 1280, he announced:
>
> > Within the Exclusive Economic Zone, the United States has, to the extent permitted by international law, (a) sovereign rights for the purpose of exploring, exploiting, conserving and managing natural resources, both living and non-living of the seabed and subsoil and the superajacent waters and with regard to other activities for the economic exploitation and exploration of the zone, such as the production of energy from the water, currents and winds . . .
>
> Proclamation No. 5030, 48 Fed. Reg. 10, 605.

Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1378 (alteration added; footnote omitted). The American Pelagic court continued:

> It is clear from this language that, at least as of 1983, the United States had asserted sovereignty with respect to the exploration, exploitation, conservation, and management of the natural resources of the EEZ. This assertion of sovereignty was subsequently codified in the 1986 amendments to the Magnuson Act:

---

(B) any fishing for such stocks

16 U.S.C. § 1802(13).

United States sovereign rights to fish and fishery management authority

(a) In the exclusive economic zone. Except as provided in section 102 [16 USCS 1812], the United States claims, and will exercise in the manner provided for in this Act, sovereign rights and exclusive fishery management authority over all fish, and all Continental Shelf fishery resources, within the exclusive economic zone. . . .

Act of Nov. 14, 1986, Pub. L. No. 99–659, tit. I, § 101(b), 100 Stat. 3706, 3706–07 (codified as amended at 16 U.S.C. § 1811 (2000)). Thus, Congress explicitly assumed "sovereign rights and exclusive fishery management authority over all fish" in the EEZ. This assumption of sovereignty indisputably encompasses all rights to fish in the EEZ.

American Pelagic Fishing Co. v. United States, 379 F.3d at 1378 (alteration in original).

In Subchapter IV, the Magnuson-Stevens Act established, under the Secretary of Commerce (the Secretary), a National Fishery Management Program, which, among other purposes, created "national standards for fishery conservation and management," 16 U.S.C. § 1851, and established eight Regional Fishery Management Councils to "prepare and submit to the Secretary (A) a fishery management plan, and (B) amendments to each such plan that are necessary from time to time (and promptly whenever changes in conservation and management measures in another fishery substantially affect the fishery for which such plan was developed)." Id. § 1852. Also, pursuant to 18 U.S.C. § 1853a(a), the Magnuson-Stevens Act authorized Regional Fishery Management Councils to submit, "for a fishery that is managed under a limited access system, a limited access privilege program to harvest fish," provided that such limited access systems, and the accompanying limited access privileges, meet further requirements. See 18 U.S.C § 1853a(b)–(i). The statute at 18 U.S.C § 1853a(b) provides:

**(b) No creation of right, title, or interest**

Limited access privilege, quota share, or other limited access system authorization established, implemented, or managed under this chapter—

(1) shall be considered a permit for the purposes of sections 1857, 1858, and 1859 of this title;

(2) may be revoked, limited, or modified at any time in accordance with this chapter, including revocation if the system is found to have jeopardized the sustainability of the stock or the safety of fishermen;

> (3) shall not confer any right of compensation to the holder of such limited access privilege, quota share, or other such limited access system authorization if it is revoked, limited, or modified;
>
> (4) shall not create, or be construed to create, any right, title, or interest in or to any fish before the fish is harvested by the holder; and
>
> (5) shall be considered a grant of permission to the holder of the limited access privilege or quota share to engage in activities permitted by such limited access privilege or quota share.

Id. (emphasis in original). The statute at 16 U.S.C. § 1853a also authorizes a Regional Fishery Management Council to "establish a policy and criteria for the transferability of limited access privileges (through sale or lease)," as well as to "establish, in coordination with the Secretary, a process for monitoring of transfers (including sales and leases) of limited access privileges." Id. With respect to the allocation of fish within a limited access system, 16 U.S.C. § 1853a(c)(5) provides:

> In developing a limited access privilege program to harvest fish a Council or the Secretary shall—
>
> (A) establish procedures to ensure fair and equitable initial allocations, including consideration of—
>
>> (i) current and historical harvests;
>>
>> (ii) employment in the harvesting and processing sectors;
>>
>> (iii) investments in, and dependence upon, the fishery; and
>>
>> (iv) the current and historical participation of fishing communities
>
> (B) consider the basic cultural and social framework of the fishery . . .
>
> (D) ensure that limited access privilege holders do not acquire an excessive share of the total limited access privileges in the program by—
>
>> (i) establishing a maximum share, expressed as a percentage of the total limited access privileges, that a limited access privilege holder is permitted to hold, acquire, or use; and

(ii) establishing any other limitations or measures necessary to prevent an inequitable concentration of limited access privileges; and

(E) authorize limited access privileges to harvest fish to be held, acquired, used by, or issued under the system to persons who substantially participate in the fishery, including in a specific sector of such fishery, as specified by the Council.

Id. (capitalization in original).

The National Marine Fisheries Service (NMFS), also known as NOAA (National Oceanic and Atmospheric Administration) Fisheries, was established in the United States Department of Commerce. See https://www.fisheries.noaa.gov/about-us#overview (last visited Aug. 27, 2021) ("NOAA Fisheries, also known as the National Marine Fisheries Service, is an office of the National Oceanic and Atmospheric Administration within the Department of Commerce."). Pursuant to the Magnuson-Stevens Act, the Secretary, through the NMFS, has the authority to approve fishery management plans and plan amendments, see 16 U.S.C. § 1854(a)(1), and has promulgated implementing regulations that govern the groundfish fisheries in the GOA and BSAI. See 50 C.F.R. § 679.1(a), (b).

The applicable regulations also require a number of licenses and permits to be held by commercial fishermen participating in the groundfish fisheries in the GOA and BSAI. See generally 50 C.F.R. § 679.4 (2021) ("Permits"). Plaintiffs in the above-captioned case reference four fishing licenses, permits, and certificates to be relevant to its claim in this court: (1) the Federal Fisheries Permit (FFP), (2) the License Limitation Program (LLP) license, (3) the Amendment 80 Quota Share (Amendment 80 QS) permit, and (4) the certificate of documentation, which includes a fishery and coastwise endorsement.[2] Regulations for the FFP, LLP, and Amendment 80 QS permit are set forth

---

[2] Unlike the FFPs, LLP licenses, and Amendment 80 QS permits assigned to plaintiffs' vessels, which are governed by regulations implemented under the Magnuson-Stevens Act, plaintiffs, in their submissions to the court, do not specifically argue that the limitations imposed by section 836 of the Coast Guard Act interfered with plaintiffs' ownership or use of their certificates of documentation and accompanying coastwise and fishery endorsements for FFI's newest vessel, America's Finest, is what appears to have prompted subsequent lobbying efforts towards Congress, which, in turn, resulted in the provisions of sections 835 and 836 being included in the Coast Guard Act in 2018. As discussed below, section 835 of the Coast Guard Act authorized the grant of a certificate of documentation with coastwise and fishery endorsements to America's Finest, while section 836 imposed the fishing restrictions which plaintiffs allege in this case amount to a taking of its vessels, licenses and permits.

in 50 C.F.R. § 679.4. With respect to the Federal Fisheries Permit (FFP), the regulations set forth at 50 C.F.R. § 679.4(b), state that "[n]o vessel of the United States may be used to retain groundfish in the GOA or BSAI or engage in any fishery in the GOA or BSAI that requires retention of groundfish, unless the owner or authorized representative first obtains an FFP for the vessel, issued under this part." Id. § 679.4(b)(1). "[A]n FFP is in effect from the effective date through the expiration date, as indicated on the FFP." Id. § 679.4(b)(3). An FFP "is not transferable or assignable and is valid only for the vessel for which it is issued." Id. § 679.4(b)(6).

In 1998, the NMFS issued a final rule implementing the License Limitation Program. See License Limitation Program, 63 Fed. Reg. 52,642 (Oct. 1, 1998). As stated in the preamble to that rule in the Federal Register, "[t]he LLP [License Limitation Program] limits the number, size, and specific operation of vessels that may be deployed in the groundfish fisheries in the exclusive economic zone (EEZ) off Alaska." Id. The preamble further states:

A license for license limitation groundfish will be issued to an eligible applicant based on fishing that occurred from an eligible applicant's qualifying vessel in management areas (i.e., BSAI, GOA, or BSAI/GOA, or state waters shoreward of those management areas) during the general qualification period (GQP), and in endorsement areas defined by these regulations (i.e., Aleutian Islands, Bering Sea, Western Gulf, Central Gulf, and Southeast Outside, or state waters shoreward of those endorsement areas) during the endorsement qualification period (EQP). A license will authorize a license holder to deploy a vessel from which directed fishing for license limitation groundfish species can be conducted in the endorsement areas designated on that license. This license also will be transferable.

Id. The specific requirements for the various endorsement areas, groundfish catch histories, vessel designations, sizes, and gear, were implemented into subsection (k) of 50 C.F.R. § 679.4, titled: "Licenses for license limitation program (LLP) groundfish or crab species." 50 C.F.R. § 679.4(k) (2020). The "[g]eneral requirements" of subsection (k) provide:

(1) General requirements.

(i) In addition to the permit and licensing requirements of this part, and except as provided in paragraph (k)(2) of this section, each vessel within the GOA or the BSAI must have an LLP groundfish license on board at all times it is engaged in fishing activities defined in § 679.2 as directed fishing for license limitation groundfish. This groundfish license, issued by NMFS to a qualified person, authorizes a license holder to deploy a vessel to conduct directed fishing for license limitation groundfish only in accordance with the specific area and species endorsements, the vessel and gear designations, the MLOA [maximum length overall] specified on the license, and any exemption from the MLOA specified on the license.

Id. § 679.4(k)(1). In accordance with the rule implementing the License Limitation Program, the following provision in subsection (a) of 50 C.F.R. § 679.4 also was implemented, which subsection applies to all of the permits which are addressed in section 679.4:

> (8) Harvesting privilege. Quota shares, permits, or licenses issued pursuant to this part are neither a right to the resource nor any interest that is subject to the "takings" provision of the Fifth Amendment to the U.S. Constitution. Rather, such quota shares, permits, or licenses represent only a harvesting privilege that may be revoked or amended subject to the requirements of the Magnuson-Stevens Act and other applicable law.

Id. § 679.4(a)(8); see also License Limitation Program, 63 Fed. Reg. at 52,654 (implementing the above regulation).

In 2007, the FMP for groundfish in the BSAI was further amended by Amendment 80, which, among other things, established the Amendment 80 Limited Access Privilege Program (Amendment 80 LAPP), and the accompanying Amendment 80 Quota Share permit (Amendment 80 QS permit). See 50 C.F.R. §§ 679.4(o), 679.90 (2020); Allocating Bering Sea/Aleutian Islands Fishery Resources, 72 Fed. Reg. 52,668 (Sept. 4, 2007). Amendment 80 allocated a specific portion of six BSAI species of groundfish (Amendment 80 species) to a limited sector of eligible BSAI non-AFA (American Fisheries Act) catcher/processor vessels using trawl gear (Amendment 80 vessels), based on their historical participation in the harvesting and processing of the six Amendment 80 groundfish species. See generally Allocating Bering Sea/Aleutian Islands Fishery Resources, 72 Fed. Reg. at 52,668–73. The six Amendment 80 species are comprised of "Aleutian Islands (AI) Pacific ocean perch (POP), BSAI Atka mackerel, BSAI flathead sole, BSAI Pacific cod, BSAI rock sole, and BSAI yellowfin sole." Id. 72 Fed. Reg. at 52,671. Amendment 80 was implemented to, among other purposes, reduce the historically high incidences of discards and waste of the Amendment 80 species by non-AFA trawl catcher/processors vessels. The preamble to the rule implementing Amendment 80 provides the following principles upon which Amendment 80 was implemented:

> One of the primary reasons for the relatively high discard rates of groundfish by non-AFA trawl catcher/processors is the nature of the fisheries in which those vessels participate. The non-AFA trawl catcher/processor sector primarily participates in non-pollock groundfish fisheries. The non-pollock groundfish fisheries are primarily comprised of groups of species that share similar habitat (e.g., flatfish fisheries such as rock sole, flathead sole, and yellowfin sole). Because these species occur together, they are typically harvested together. When a non-AFA trawl catcher/processor retrieves its net, very often multiple species of fish are present. If a vessel operator is targeting only one species of fish, and other species are retrieved along with the desired catch, the vessel operator may have an incentive to discard the

> less valuable species and retain only the higher value species. The multi-species nature of these fisheries makes it difficult for vessel operators to target only one species, and an economic incentive is created to discard less valuable fish.
>
> NMFS establishes a total allowable catch (TAC) for each of the non-pollock groundfish fisheries based on the species' annual biomass with the goal of providing a conservatively managed sustainable yield. Harvesters compete for the TAC, resulting in a "race for fish," wherein vessels attempt to maximize their harvest in as little time as possible, in order to claim as large a share as possible of the available TAC. This race for fish increases the economic incentive to discard less valuable species in a multi-species harvest, and accelerates the harvest rate for the more valuable species.
>
> Because vessel operators are competing with each other for harvest of a common TAC, a vessel operator has little economic incentive to undertake actions to reduce unwanted incidental catch, such as searching for fishing grounds with lower bycatch rates, or using gear modifications that may reduce bycatch but have lower harvest rates, if those actions would limit the ability of that vessel to effectively compete with other vessels.
>
> Additionally, a vessel operator has little incentive to process and store less valuable species if by doing so, he loses an opportunity to use that processing or storage capacity for more valuable catch. Therefore, an individual vessel operator has strong incentives to harvest fish as quickly as possible, and discard less valuable species before the TAC limit is reached because all vessel operators are competing for a limited TAC.

Id., 72 Fed. Reg. at 52,669–70. As further explained in the preamble to the rule implementing Amendment 80, the establishment of a limited access privilege program (LAPP) is a method which can reduce the incidence of waste brought about by discarding less desirable fish:

> The primary method to offset the economic incentives that lead to a race for fish and relatively high discard rates is to reduce the impact of those incentives through a LAPP. LAPPs have been used extensively in the North Pacific as a means to encourage economic efficiency and less wasteful harvest methods, and to resolve allocation disputes among harvesters by providing a group of harvesters with exclusive harvest privileges that can be traded. . . .
>
> A LAPP allows vessel operators to make operational choices to reduce discards of fish because the strong incentives to maximize catch in the minimum amount of time have been reduced. If a vessel operator receives an exclusive portion of the TAC for non-pollock groundfish species, . . . he knows that he need not compete with other harvesters. That vessel operator

can then choose to fish in a slower and less wasteful fashion, use modified gear with a lower harvest rate but which reduces bycatch, coordinate with other vessel operators to avoid areas of high bycatch, process fish in ways that yield increased value but which are possible only by slowing the processing rate, or otherwise operate in ways that limit bycatch.

Id., 72 Fed. Reg. at 52,670. The regulation preamble further indicated, however, that a potential adverse effect could arise from the establishment of a LAPP, in that LAPP participants could potentially "use their excess fishing capacity to expand operations into other fisheries that are not managed by LAPPs and increase the race for fish in those fisheries unless they are constrained." Id. Therefore, LAPPs can be accompanied by "sideboard" limitations for participants with respect to fisheries not included in the LAPP, and operate to restrict increased participation in non-LAPP fisheries.

Following the above principles, Amendment 80 was implemented in 2007, and as explained in the preamble to the rule which implemented Amendment 80:

NMFS issues a final rule to implement Amendment 80 to the Fishery Management Plan for Groundfish of the Bering Sea and Aleutian Islands Management Area (FMP). Amendment 80 (hereinafter the "Program") primarily allocates several Bering Sea and Aleutian Islands (BSAI) non-pollock trawl groundfish fisheries among fishing sectors, and facilitates the formation of harvesting cooperatives in the non-American Fisheries Act (AFA) trawl catcher/processor sector. The program establishes a limited access privilege program (LAPP) for the non-AFA trawl catcher/processor sector. This action is necessary to increase resource conservation and improve economic efficiency for harvesters who participate in the BSAI groundfish fisheries. This action is intended to promote the goals and objectives of the Magnuson-Stevens Fishery Conservation and Management Act (MSA), the FMP, and other applicable law. . . .

The Program meets the broad goals of (1) improving retention and utilization of fishery resources by the non-AFA trawl catcher/processor fleet by extending the groundfish retention standard (GRS) to all non-AFA trawl catcher/processor vessels; (2) allocating fishery resources among BSAI trawl harvesters in consideration of historic and present harvest patterns and future harvest needs; (3) establishing a LAPP for the non-AFA trawl catcher/processors and authorizing the allocation of groundfish species to harvesting cooperatives to encourage fishing practices with lower discard rates and to improve the opportunity for increasing the value of harvested species while lowering costs; and (4) limiting the ability of non-AFA trawl catcher/processors to expand their harvesting capacity into other fisheries not managed under a LAPP.

Id. Specifically, the Amendment 80 LAPP assigned "Amendment 80 quota share (QS) for Amendment 80 species based on catch by Amendment 80 vessels." Id., 72 Fed. Reg. at

52,672. "The [Amendment 80] Program assigns Amendment 80 QS based on historic catch patterns of an Amendment 80 vessel during 1998 through 2004 and on the relative proportion of an Amendment 80 species harvested by an Amendment 80 vessel compared to all other Amendment 80 vessels." Id. Amendment 80 also facilitates Amendment 80 QS permit holders to establish cooperatives, which NMFS contemplates as further increasing the harvesting efficiency of the Amendment 80 species. As explained in the rule which implemented Amendment 80:

> Persons that receive Amendment 80 QS can join a cooperative to receive an exclusive harvest privilege for a portion of the ITAC [Initial Total Allowable Catch]. Amendment 80 QS holders can form a cooperative with other Amendment 80 QS holders on an annual basis, provided they meet specific criteria. Each Amendment 80 cooperative will receive an annual cooperative quota (CQ), an amount of Amendment 80 species ITAC that will be for the exclusive use by that cooperative for harvest in a given year. The Program establishes requirements for forming an Amendment 80 cooperative with other Amendment 80 QS holders, the allocation of annual CQ to a cooperative, and transfers of CQ among cooperatives.

> A cooperative will receive an amount of CQ equivalent to the proportion of QS held by all of the members of the cooperative relative to the total QS held by all Amendment 80 QS holders. . . .

> The Program provides opportunities for Amendment 80 sector participants to trade harvest privileges among cooperatives to further encourage economically efficient fishing operations. An Amendment 80 cooperative will not be able to transfer CQ to the Amendment 80 limited access fishery or to the BSAI trawl limited access sector.

Id.  The "BSAI trawl limited access sector" referenced above includes those participants, such as AFA trawl catcher/processors, which participate in the Amendment 80 fisheries, but are not included in the Amendment 80 LAPP. Participants in the "BSAI trawl limited access sector" receive a portion of the TAC for Amendment 80 fisheries which is separate from the portion of the TAC which is allocated to Amendment 80 LAPP participants. See id., 72 Fed. Reg. at 52,671. The "BSAI trawl limited access sector" is also separate from the "Amendment 80 limited access fishery," the latter of which is comprised of those Amendment 80 QS permit holders participating in the Amendment 80 LAPP, but which participants elect not to join an Amendment 80 cooperative. As explained in the preamble to the Amendment 80 final rule:

> Amendment 80 QS holders that do not join an Amendment 80 cooperative can participate in the Amendment 80 limited access fishery. The Program will assign to the Amendment 80 limited access fishery the amount of the Amendment 80 sector's allocation of Amendment 80 species ITAC . . . that remains after allocation to all of the Amendment 80 cooperatives. Participants fishing in the Amendment 80 limited access fishery will continue

to compete with each other; will not realize the same potential benefits from consolidation and coordination; and will not receive an exclusive harvest privilege that accrues to members of an Amendment 80 cooperative. NMFS will manage the Amendment 80 limited access fishery similar to the way the fisheries were managed prior to implementation of the program.

Id., 72 Fed. Reg. at 52,672.

Amendment 80 also established "GOA Sideboard Limits," which, as explained in the preamble to the Amendment 80 final rule,

are catch limits that restrict the ability of participants eligible for this Program to expand their harvest efforts in the GOA. The Program is designed to provide certain economic advantages to participants. Program participants could use this economic advantage to increase their participation in other fisheries, primarily in the GOA fisheries, adversely affecting the participants in those fisheries. Therefore, the Program limits the total amount of catch in other groundfish fisheries that could be taken by Amendment 80 vessels, including harvests made in State of Alaska (State) waters that are open during Federal fishing seasons to allow the harvest of fish assigned to the Federal TAC—commonly known as the "parallel" groundfish fisheries. GOA groundfish and halibut PSC [prohibited species catch] sideboards will limit the catch by Amendment 80 vessels to historic levels in the GOA.

Sideboards limit harvest of Pacific cod, pollock, and rockfish fisheries in the GOA, the eligibility of Amendment 80 vessels to participate in GOA flatfish fisheries, and the amount of halibut PSC that Amendment 80 vessels could catch when harvesting groundfish in the GOA. Sideboards apply to all Amendment 80 vessels, with a limited exemption for the F/V GOLDEN FLEECE.

Id., 72 Fed. Reg. at 52,772–73 (capitalization in original).

In 2012, NMFS implemented Amendment 97 to the Fishery Management Plan for BSAI groundfish, which allowed "the owner of a trawl catcher/processor vessel authorized to participate in the Amendment 80 catch share program to replace that vessel with a vessel that meets certain requirements." Amendment 97, 77 Fed. Reg. 59,852 (Oct. 1, 2012). Amendment 97 established

the regulatory process for replacement of vessels in the Amendment 80 fleet and the requirements for Amendment 80 replacement vessels, such as a limit on the overall length of a replacement vessel, a prohibition on the use of an AFA vessel as a replacement vessel, measures to prevent a replaced vessel from participating in Federal groundfish fisheries off Alaska that are not Amendment 80 fisheries, and measures that extend specific catch limits (known as Amendment 80 sideboards) to a replacement vessel.

Id.

The "Built in the United States" Requirement

In addition to the three required permits and licenses discussed above, the FFP, the LLP license, and the Amendment 80 QS permit, an additional certification is relevant to plaintiffs' amended complaint, which is the certificate of documentation, and the "fishery" and the "coastwise" endorsements that accompany it. Unlike the FFP, LLP license, or Amendment 80 QS permit, the certificate of documentation and accompanying fishery and coastwise endorsements are not governed by the Magnuson-Stevens Act, but are required under "Shipping," Title 46 of the United States Code. See 46 U.S.C. §§ 12101, et seq. Pursuant to 46 U.S.C. § 12102, titled: "Vessels requiring documentation," "a vessel may engage in a trade only if the vessel has been issued a certificate of documentation with an endorsement for that trade under this chapter." Id. Relevant to above-captioned case, both the fishery and coastwise endorsements require that the vessel be "built in the United States," subject to exceptions not relevant to this case. See 46 U.S.C. §§ 12112(a)(2)(A) (coastwise endorsement), 12113(a)(2) (fishery endorsement). Pursuant to the regulation at 46 C.F.R. § 67.97 (2020):

> To be considered built in the United States a vessel must meet both of the following criteria:
>
> (a) All major components of its hull and superstructure are fabricated in the United States; and
>
> (b) The vessel is assembled entirely in the United States.

Id.

Events Leading Up to Plaintiffs' Action in this Court

As alleged by plaintiffs in the above-captioned case:

> Over the course of the seventeen years since the passage of Amendment 80, the active fleet has consolidated through mergers and acquisitions from 27 vessels owned by nine companies to 21 vessels owned by five companies. Two of those companies are at the legal maximum ownership cap of 30% for Amendment 80 QS. FFI and two other companies are not.

Up until 2014, FFI had a fleet operating in the groundfish fisheries of the GOA and BSAI areas of the EEZ which was comprised of two vessels: *American No. 1*, initially operating under the LLP license: LLG 2028; and *U.S. Intrepid*, operating under the LLP license: LLG 3662. Both *American No. 1* and *U.S. Intrepid* also were assigned Amendment 80 QS permits under their respective LLP licenses, meaning that they were permitted to participate in the harvesting of the portion of the Total Allowable Catch for the six

Amendment 80 fisheries reserved for Amendment 80 vessels. See 50 C.F.R. Part 679, Table 31 (listing the "LLP license number[s] originally assigned to the Amendment 80 vessel[s]," including for *American No. 1* and *U.S. Intrepid*).

FFI alleges that in November 2014, it "signed a contract to build a new catcher-processor vessel, the *America's Finest*, with Dakota Creek Industries, Inc. ('DCI') of Anacortes, Washington, at a cost of more than $70 million. The contract had a delivery date in November 2017." Plaintiffs further allege that in March 2017, "FFI received written approval from NMFS to use *America's Finest* as an Amendment 80 replacement vessel for *American No. 1*. This approval allowed FFI to transfer, without modification or reduction, all of the fishery licenses, permits and endorsements for *American No. 1* to *America's Finest*."

In addition, plaintiffs alleges that in February 2017,

FFI purchased LLG 3217 ("the *Defender* LLP") from Nordic Fisheries, Inc. at a cost of more than $30 million. LLG 3217 had previously been assigned to the *Defender*, which is not and has never been owned by FFI. The *Defender* LLP contains three species and area endorsements: "Bering Sea Groundfish/Amendment 80," "Central Gulf Groundfish" and "Western Gulf Groundfish". *Defender* was also listed as one of only eleven vessels that can be used to fish in the GOA flatfish fisheries. The GOA endorsements and associated *Defender* fishing history enabled FFI to harvest unallocated non-Amendment 80 Species of fish in locations and amounts previously unavailable to FFI, including the West Yakutat region of the GOA. NMFS reviewed the purchase documents, approved the purchase and transferred title to the *Defender* LLP to FFI.

(capitalization in original). With the purchase of the *Defender* LLP and FFI's new catcher/processor vessel, *America's Finest*, to replace *American No. 1*, FFI "obtained permission from NMFS to transfer the *Defender* LLP to *American No. 1*," and "NMFS also approved *American No. 1* as an Amendment 80 replacement vessel for *Defender*." Plaintiffs continue that "[t]hese approvals would have allowed *American No. 1* to participate in all of the fisheries included in the *Defender* LLP endorsements, including West Yakutat Pacific ocean perch." (capitalization in original). Plaintiffs allege that "[w]ith these transfers and the purchase of the *Defender* LLP, FFI had the licenses, permits and endorsements to operate three vessels instead of two."

Plaintiffs allege, however, that in March 2017, DCI, the shipyard company contracted to build *America's Finest*, informed FFI that DCI "may have made a mistake in complying with the U.S. Built Requirement for fishing vessels by incorporating a very small amount of imported 'cold-formed' steel components into *America's Finest*'s hull." (capitalization in original). As further explained in plaintiffs' amended complaint:

This plating was ordered by DCI working with Seattle-based, internationally reputable marine architects hired by DCI to do the "nesting" and "lofting" for

14

the vessel. These plates were bent and beveled in Holland, then purchased by and shipped to Seaport Steel in Seattle, Washington, under the supervision of a reputable Seattle-based marine engineer. The cold-formed steel was suitable for installation on *America's Finest* only after extensive custom fabrication work in Washington State over many months. DCI apparently reasoned that the foreign steel satisfied the U.S. Built Requirement for fishing vessels because the cold-formed steel was a very small amount, was commercially unavailable in the United States and more than 51% of the added value in the steel plates stemmed from work performed in the United States. Although these last two factors satisfy the "Buy U.S." regulations applicable to the construction of federal government ships, DCI, its Seattle-based marine architect, and Seaport Steel were all apparently unaware that the Coast Guard applies unpublished agency guidelines which impose much more restrictive build requirements to fishing vessels. The shipyard's mistake, if made, could have rendered *America's Finest* ineligible to participate in U.S. fisheries.

Plaintiffs' amended complaint continues:

> In or about July or August 2017, DCI brought the issue to the attention of the Coast Guard and asked the National Vessel Documentation Center ("NVDC") for a determination as to whether the vessel could be delivered as a documented U.S. vessel with fishing and coastwise endorsements, given that the build error was inadvertent and the foreign steel constituted less than 0.8% of the value of the ship. On August 31, 2017, the NVDC ruled that use of the cold-formed components rendered *America's Finest* ineligible to receive a certificate of documentation with a fisheries or coastwise endorsement. On September 21, 2017, the Commandant of the Coast Guard denied an appeal of this ruling.

The Coast Guard Act of 2018

After the Coast Guard's ruling against FFI and DCI, plaintiffs allege that "[i]n 2017 and 2018, DCI lobbied the U.S. Congress to grant a waiver to the U.S. Built Requirement" (capitalization in original), for *America's Finest*, which, as discussed above, is necessary for vessels to receive the fishery and coastwise endorsements on the certificate of documentation. See 46 U.S.C. §§ 12112(a)(2)(A) and 12113(a)(2). Subsequently, in December 2018, the Coast Guard Act, "an Act To authorize appropriations for the Coast Guard, and for other purposes," (capitalization in original), was passed, and, among many other provisions unrelated to the issues of this case, in section 835, included a waiver of the "built in the United States" requirements for *America's Finest*. That section of the Coast Guard Act, titled: "**VESSEL WAIVER**," states, in full:

> (a) IN GENERAL.—Upon the date of enactment of this Act and notwithstanding section 12112(a)(2)(A) and 12113(a)(2) of title 46, United

States Code, the Secretary shall issue a certificate of documentation with a coastwise and fishery endorsements to the certificated vessel.

(b) REPLACEMENT VESSEL.—The certificated vessel shall qualify as a replacement vessel for the vessel "AMERICA NO. 1" (United States official number 610654) and not be precluded from operating as an Amendment 80 replacement vessel under the provisions of part 679 of title 50, Code of Federal Regulations.

(c) COAST GUARD REVIEW AND DETERMINATION.—

    (1) REVIEW.— Not later than 30 days after the date of enactment of this Act, the Secretary shall conduct a review of the use of certain foreign fabricated steel components in the hull or superstructure of the certificated vessel.

    (2) DETERMINATION.—Based on the review conducted under paragraph (1), the Secretary shall determine whether the shipyard that constructed the certificated vessel or the purchaser of the certificated vessel knew before such components were procured or installed that the use of such components would violate requirements under sections 12112(a)(2)(A) and 12113(a)(2) of title 46, United States Code.

    (3) REVOCATION.—If the Secretary determines under paragraph (2) that the shipyard that constructed the certificated vessel or the purchaser of the certificated vessel knew before such components were procured or installed that the use of such components would violate requirements under sections 12112(a)(2)(A() and 12113(a)(2) of title 46, United States Code, the Secretary shall immediately revoke the certificate of documentation issued under subsection (a).

    (4) USE OF DOCUMENTS.—In conducting the review required under paragraph (1), the Secretary may request and review any information, correspondence, or documents related to the construction of the certificated vessel, including from the shipyard that constructed the certificated vessel and the purchaser of the certificated vessel.

(d) TERMINATION.—If the contract for purchase of the certificated vessel that is in effect on the date of enactment of this Act is terminated, the purchasing party to that contract shall be prohibited from entering into a subsequent contract or agreement for purchase of such vessel.

(e) DEFINITIONS.—In this section:

> (1) CERTIFICATED VESSEL.—The term "certificated vessel" means the vessel America's Finest (United States official number 1276760).

> (2) SECRETARY.—The term "secretary" means the Secretary of the department in which the Coast Guard is operating, acting through the Commandant of the Coast Guard.

Coast Guard Act, § 835, 132 Stat. at 4319–20 (capitalization and emphasis in original). In accordance with the above provisions, plaintiffs allege that "[t]he Coast Guard issued a certificate of documentation with coastwise and fishery endorsements for *America's Finest* on December 17, 2018." Plaintiffs also allege that "[o]n January 2, 2019, the Coast Guard sent a letter to the U.S. Congress stating that it had completed the review required by section 835 of the Coast Guard Act, and that it had determined that neither DCI nor FFI 'knew before the [foreign fabricated steel] components were procured or installation commenced that the use of the components would violate the statutory requirements.'" (alteration in plaintiffs' amended complaint). There is no dispute between the parties that plaintiffs' vessel, *America's Finest*, was duly issued a certificate of documentation with fishery and coastwise endorsements in accordance with the above provisions of section 835 of the Coast Guard Act, or that FFI or DCI did not knowingly violate the "built in the United States" requirements of 46 U.S.C. §§ 12112(a)(2)(A) (coastwise endorsement) and 12113(a)(2) (fishery endorsement).

In addition to section 835, however, the Coast Guard Act also enacted section 836, titled: **"TEMPORARY LIMITATIONS**." (capitalization and emphasis in original). As discussed below, the provisions in section 836 of the Coast Guard Act are the provisions which plaintiffs in the above-captioned case allege amount to a Fifth Amendment takings of plaintiffs' property rights without just compensation. Section 836 of the Coast Guard Act states, in full:

> (a) LIMITATIONS.—

> > (1) IN GENERAL.—Upon the Coast Guard issuing a certificate of documentation with coastwise and fishery endorsements for the vessel "AMERICA'S FINEST" (United States official number 1276760) and during any period such certificate is in effect, and subject to subsection (b), the total amount of groundfish harvested with respect to subparagraph (A) or the total amount of deliveries processed from other vessels with respect to subparagraph (B) by the vessels described in paragraph (2) shall not collectively exceed—

(A) the percentage of the harvest available in any Gulf of Alaska groundfish fisheries (other than fisheries subject to a limited access privilege program created by the North Pacific Fishery Management Council) that is equivalent to the total harvest by the vessels described in paragraph (2) in those fisheries in the calendar years that a vessel described in paragraph (2) had harvest [sic] from 2012 through 2017 relative to the total allowable catch available to such vessels in the calendar years 2012 through 2017; or

(B) the percentage of processing of deliveries from other vessels in any Bering Sea, Aleutian Islands, and Gulf of Alaska groundfish fisheries (including fisheries subject to a limited access privilege program created by the North Pacific Fishery Management Council, or community development quotas as described in section 305(i) of the Magnuson-Stevens Fishery Conservation and Management Act (16 U.S.C. 1855(i))) that is equivalent to the total processing of such deliveries by the vessels described in paragraph (2) in those fisheries in the calendar years 2012 through 2017 relative to the total allowable catch available in the calendar years 2012 through 2017.

(2) APPLICABLE VESSELS.—The limitations described in paragraph (1) shall apply, in the aggregate, to—

(A) the vessel AMERICA'S FINEST (United States official number 1276760);

(B) the vessel US INTREPID (United States official number 604439);

(C) the vessel AMERICAN NO. 1 (United States official number 610654):

(D) any replacement of a vessel described in subparagraph (A), (B), or (C); and

(E) any vessel assigned license number LLG3217 under the license limitation program

18

under part 679 of title 50, Code of Federal Regulations.

(b) EXPIRATION.—The limitations described in subsection (a) shall apply to a groundfish species in Bearing Sea, Aleutian Islands, and Gulf of Alaska only until the earlier of—

(1) the end of the 6-year period beginning on the date of enactment of this Act; or

(2) the date on which the Secretary of Commerce issues a final rule, based on recommendations developed by the North Pacific Fishery Management Council consistent with the Magnuson-Stevens Fishery Conservation and Management Act (16 U.S.C. 1801 et seq.), that limits processing deliveries of that groundfish species from other vessels in any Bearing Sea, Aleutian Islands, and Gulf of Alaska groundfish fisheries that are not subject to conservation and management measures under section 206 of the American Fisheries Act (16 U.S.C. 1851 note).

(c) EXISTING AUTHORITY.—Except for the measures required by this section, nothing in this title shall be construed to limit the authority of the North Pacific Fishery Management Council or the Secretary of Commerce under the Magnuson-Stevens Fishery Conservation and Management Act (16 U.S.C. 1801 et seq.).

Coast Guard Act, § 836, 132 Stat. at 4320–21 (capitalization in original). In effect, the limitations set forth in section 836(a)(1)(A) and (B) of the Coast Guard Act, which limitations plaintiffs refer to as the "Coast Guard Act Sideboards," operate to restrict, for a maximum of six years, FFI's ability to increase its harvesting efforts in non-LAPP, GOA groundfish fisheries past the amounts it had harvested such GOA groundfish in the five years preceding the Coast Guard Act,[3] as well as FFI's ability to increase processing for other vessels of all GOA and BSAI groundfish fisheries, including the six Amendment 80

---

[3] The Coast Guard Act Sideboards, which, in section 836(a)(1)(A), limit FFI's potential harvesting efforts only in the GOA, do not impact FFI's potential harvesting efforts of the six Amendment 80 fisheries, because Amendment 80 only applies to those species as they exist in the BSAI management area, not the GOA management area. See generally 50 C.F.R. § 679.91; Allocating Bering Sea/Aleutian Islands Fishery Resources, 72 Fed. Reg. at 52,760 ("NMFS issues a final rule to implement Amendment 80 to the Fishery Management Plan for Groundfish of the Bering Sea and Aleutian Islands Management Area (FMP)."). In addition, section 836(a)(1)(A) exempts from its harvesting limitations, "fisheries subject to a limited access privilege program created by the North Pacific Fishery Management Council." Coast Guard Act, § 836(a)(1)(A), 132 Stat. at 4320.

species, past the amounts it had processed groundfish for other vessels in the five years preceding the Coast Guard Act. See id. § 836(a)(1)(A), (B), 132 Stat. at 4320–21. For example, as explained by plaintiffs, the Coast Guard Act Sideboards

> reduce the amount of arrowtooth flounder that FFI vessels have historically caught in the GOA. The GOA arrowtooth flounder fishery is an open access fishery with no quotas or sideboards for any participants. The TAC for arrowtooth flounder is approximately 70,000 MT [metric tons]. Using two ships, FFI's historical average catch was 6,200 MT, or 3,100 MT per ship. The purchase of the *Defender* LLP would have allowed FFI to fish a third vessel in this fishery and harvest an additional 3,100 MT. However, the Coast Guard Act Sideboards limit arrowtooth flounder catch by FFI vessels to 6,200 MT in the aggregate. The value of the lost 3,100 MT is approximately $4.03 million per year, for an estimated total of $24.18 million over six years.

As another example, plaintiffs allege that

> the Coast Guard Act Sideboards prohibit FFI from harvesting GOA rex sole. GOA rex sole is a high value, open access fishery with no quota. FFI's LLPs 3662 [assigned to *U.S. Intrepid*] and 2028 [originally assigned to *American No. 1* and allegedly approved for transfer to *America's Finest*] allowed FFI to fish for rex sole, but FFI had not done so during the years chosen in section 836 of the Coast Guard Act to establish sideboard limits, thereby establishing a catch limit for FFI of zero for six years. The estimated annual harvest loss to FFI is approximately $1.5 million annually, for an estimated total of $9 million over six years.

(alterations added). As a third example, this time with respect to the limitations to plaintiffs' ability to process groundfish for other vessels, plaintiffs allege:

> The Coast Guard Act Sideboards limit the amount of yellowfin sole that all three FFI vessels can buy from these [independent catcher] vessels to 2,000 metric tons ("MT"). Independent catcher vessels typically catch approximately 7,000 MT of yellowfin sole and sell it to motherships for processing. However, these catcher vessels now take the majority of their catch elsewhere because FFI is prohibited by the Coast Guard Act from processing more than 2,000 MT of yellowfin sole. In addition, FFI loses the opportunity to purchase and process these catcher vessels' incidental catch of other valuable species such as rock sole, pollock and cod. In all, FFI suffers a net annual loss from this sideboard of approximately $2.9 million, for an estimated total of $17.4 million over six years.

FFI also alleges that because of the Coast Guard Act Sideboards, FFI, despite its purchase of the *Defender* LLP license, which, unlike FFI's other LLP licenses, has an endorsement for "West Yakutat Pacific ocean perch,"

> is unable to use the relevant endorsement to fish in the West Yakutat Pacific ocean perch fishery that it purchased in 2017 at a cost of $10 million. As a result of the Coast Guard Act, this valuable endorsement is now worthless for six years solely because it is assigned to a vessel owned by FFI. In addition, because it cannot fish for West Yakutat Pacific ocean perch, the estimated annual harvest loss to FFI is approximately $1 million annually, for an estimated total of $6 million over six years.

(capitalization in original). Plaintiffs also allege that because "FFI's vessels are uniquely valuable because of the specific LLPs, permits and endorsements appurtenant to them,"

> the Coast Guard Act precludes FFI's vessels in the aggregate from being used to harvest and process to the full extent that their catch histories would allow. Because the Coast Guard Act Sideboards transfer with the physical vessel in any sale, and FFI's remaining vessels would fish the maximum amounts allowed under these collective sideboards, FFI's vessels have lost a substantial part of their fair market value, estimated as follows:
>
> > a. *U.S. Intrepid* diminished value due to unmarketable title: estimated $5 million.
> >
> > b. *American No. 1* diminished value due to unmarketable title: estimated $5 million.

In total, plaintiffs' amended complaint alleges that the limitations set forth in section 836 of the Coast Guard Act have, or will, cause FFI "damages in excess of $78.2 million."

<u>Procedural History</u>

On August 21, 2020, plaintiffs filed the above-captioned case in this court. On September 28, 2020, plaintiffs filed an amended complaint. Plaintiffs' amended complaint contains a single cause of action of "**Unlawful Taking without Just Compensation**," (capitalization and emphasis in original), and requests "an award of just compensation of no less than $78.2 million in a total amount to be proven at trial," as well as pre- and post-judgment interest, "reasonable attorneys' fees and costs of suit, including payment of experts' fees and expenses," "such orders necessary to provide an entire remedy and to complete the relief afforded in the judgment," and "such other and further relief within its jurisdiction as the Court may deem just and proper." (capitalization in original). Defendant subsequently moved to dismiss plaintiffs' amended complaint for failure to state a claim, pursuant to Rule 12(b)(6) (2020) of the Rules of the United States Court of Federal Claims (RCFC). Plaintiffs filed a response to defendant's motion to dismiss, to which defendant replied, and the court held oral argument.

**DISCUSSION**

As discussed above, in its amended complaint currently before the court, plaintiffs allege that section 836 of the Coast Guard Act "unlawfully takes private property rights earned and purchased by FFI in the form of fisheries licenses, endorsements and permits for a period of up to six years after the enactment of the Coast Guard Act." Plaintiffs continue that "[t]he restrictions imposed by section 836 deprive FFI of property rights under exclusive, transferrable and valuable licenses, endorsements and permits to harvest and process various species of species of [sic] fish in the Bering Sea, Aleutian Islands (collectively 'BSAI') and Gulf of Alaska ('GOA'), in the United States Exclusive Economic Zone ('USEEZ')." Plaintiffs also allege that "[b]ecause these licenses, permits and endorsements must be used only by the particular vessel specified in the license, permit or endorsement, section 836 also devalues Plaintiff's vessels and deprives it of property rights in those vessels." (capitalization in original). Plaintiffs also point out that "[t]he restrictions in section 836 do not apply to any other of the finite number of vessels, licenses, endorsements and permits owned by other qualifying participants in these fisheries," except for those owned by FFI. In its amended complaint, plaintiffs do not indicate whether it is arguing that regulatory takings, as opposed to physical takings, have occurred, or whether or not they were categorical or non-categorical regulatory takings. In their response to defendant's motion to dismiss, however, plaintiffs state that they allege "non-categorical regulatory takings for a period of six years."

Defendant first argues in its motion to dismiss that FFI has failed to state a Fifth Amendment takings claim because it has not and cannot allege a cognizable property interest. Specifically, defendant argues, characterizing plaintiffs' amended complaint as attempting to allege non-categorical regulatory takings, that "the United States Court of Appeals for the Federal Circuit held long ago that fishing companies like FFI do not have a cognizable property interest in the licenses, permits, and endorsements that govern their vessels." Defendant also argues that plaintiffs fail to allege a cognizable property interest in using its vessels for harvesting or processing fish that it catches, or in using its vessels to process fish from third-party vessels. In arguing that plaintiffs fail to allege a cognizable property interest, defendant cites to cases issued by the United States Court of Appeals for the Federal Circuit, such as American Pelagic Fishing Co. v. United States, 379 F.3d 1363; Conti v. United States, 291 F.3d 1334, 1340 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2002), cert. denied, 537 U.S. 1112 (2003); and Mitchell Arms, Inc. v. United States, 7 F.3d 212 (Fed. Cir. 1993), cert. denied, 511 U.S. 1106 (1994). As discussed below, the cases of Conti and American Pelagic involved the alleged Fifth Amendment regulatory takings of each of those plaintiffs' vessels, fishing gear, and/or various permits issued under the Magnuson-Stevens Act statutory and regulatory scheme, similar to the alleged property interests at issue in the above-captioned case, and found that the respective plaintiffs did not have cognizable property interests in the vessels and/or various permits, such that it could succeed in a Fifth Amendment takings claim. See generally Conti v. United States, 291 F.3d at 1340–45 (holding that plaintiff did not have a cognizable property interest, for purposes of a Fifth Amendment takings claim, in "(i) his swordfish permit; (ii) his vessel, the *Providenza*; and (iii) his gillnets and related gear," following a "ban on drift gillnet swordfishing"); Am. Pelagic Fishing Co. v.

United States, 397 F.3d at 1383 ("[B]ecause the Magnuson Act assumed sovereignty for the United States over the management and conservation of the resources located in the EEZ, and specifically over fishery resources, American Pelagic did not have, as one of the sticks in the bundle of property rights that it acquired with title to the *Atlantic Star*, the right to fish for Atlantic Mackerel and herring in the EEZ. American Pelagic thus did not possess the property right that it asserts formed the basis for its takings claim. In the absence of that property right, its claim is fatally defective."). Defendant also argues, relying on such cases, that "[w]hen called upon to review takings claims arising out of a Government-issued license or permit, the Federal Circuit has offered a simple rule: discretionary licenses and permits that are necessary to participate in a highly-regulated industry do not, as a matter of law, create a cognizable property interest." (capitalization in original). Defendant argues that plaintiffs' various licenses and permits do not meet the indicia outlined by the Federal Circuit which generally amount to a cognizable property interest, namely, transferability, exclusivity, revocability, and congressional intent. (citing Conti v. United States, 291 F.3d at 1341–42; Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1374). Defendant also points to the Magnuson-Stevens Act at 16 U.S.C. § 1853a(b), which, as discussed above, states that limited access privileges and quota shares "may be revoked, limited, or modified at any time in accordance with this chapter;" "shall not confer any right of compensation to the holder of such limited access privilege, quota share, or other such limited access system authorization if it is revoked, limited, or modified;" "shall not create, or be construed to create, any right, title, or interest in or to any fish before the fish is harvested by the holder;" and "shall be considered a grant of permission to the holder of the limited access privilege or quota share to engage in activities permitted by such limited access privilege or quota share." Id. § 1853a(b)(2)–(5). Defendant also points to the title 50, Part 679 permit regulations, discussed above, which state that the FFP, the LLP license, and the Amendment 80 QS permit, as well as all other permits discussed in Part 679, "are neither a right to the resource nor any interest that is subject to the 'takings' provision of the Fifth Amendment to the U.S. Constitution." 50 C.F.R. § 679.4(a)(8). Finally, and notwithstanding plaintiffs' inability to allege a cognizable property interest, defendant argues that plaintiffs have failed to sufficiently allege a non-categorical regulatory takings claim under the Penn Central factors. See, e.g., Rose Acre Farm, Inc. v. United States, 559 F.3d 1260, 1267 (Fed. Cir.) (listing the Penn Central factors as "(1) the economic impact of the action on the claimant, (2) the effects of the governmental action on the reasonable investment-backed expectations of the claimant, and (3) the character of the governmental action" (citing Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 123-24, reh'g denied, 439 U.S. 883 (1978))), reh'g en banc denied (Fed. Cir. 2009), cert. denied, 559 U.S. 935 (2010). Defendant argues, however, that the court need not reach a Penn Central analysis if the court determines "that FFI has not alleged a cognizable property interest in its amended complaint." (citing Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372 ("If the claimant fails to demonstrate the existence of a legally cognizable property interest, the courts [sic] task is at an end.")).

In plaintiffs' response to defendant's motion to dismiss, plaintiffs argue that they do have cognizable property interests in their vessels, licenses and permits, which plaintiffs allege were taken by the "Coast Guard Act Sideboards" of section 836 of the

Coast Guard Act. Plaintiffs characterize their licenses and permits as "appurtenances" attached to their vessels, according to maritime law. In plaintiffs' response, plaintiffs attempt to distinguish their LLP licenses and Amendment 80 QS permits from those which were at issue in <u>Conti</u> and <u>American Pelagic</u>, arguing that the LLP license and the Amendment 80 QS permit "have all the hallmarks of private property that were lacking in the commercial fishing licenses examined by the cases relied upon by Defendant, all of which pre-dated the 2007 amendments to the MSA [Magnuson-Stevens Act] creating limited access privilege programs." (alteration added). Plaintiffs point out that the Part 679 regulations at issue in the FFI case "allow a groundfish license and Amendment 80 QS permits to be transferred if certain eligibility criteria are met," (citing 50 C.F.R. § 679.4(k) (LLP license regulations) and 50 C.F.R. § 679.94 (Amendment 80 regulations)), and "[t]he mere fact that transfers are not unrestricted does not undermine their transferability for characterization as property." (citing <u>Members of Peanut Holders Ass'n, Inc. v. United States</u>, 421 F.3d 1323 (Fed. Cir.) (holding that a "statutorily created peanut quota" constituted a property interest, but not one that was compensable under the Fifth Amendment), <u>reh'g</u> <u>en</u> <u>banc</u> <u>denied</u> (Fed. Cir. 2005), <u>cert.</u> <u>denied</u> 548 U.S. 904 (2006)). Plaintiffs also attempt to argue that the "Amendment 80 regulatory structure was designed to, and in fact does exclude all but the finite number of qualifying vessels, of which 21 vessels owned by five companies remain active. Only these boats, owned by these companies, can fish for the portion of the TAC allocated to Amendment 80 QS holders." With respect to revocability, plaintiffs take issue with the way in which the restrictions to its potential harvesting and processing efforts were implemented through section 836 of the Coast Guard Act, as opposed to regulations promulgated by NMFS which could operate to equally restrict all participants in a given fishery. Plaintiffs explain:

> FFI's licenses were not revoked in an administrative hearing by NMFS acting under its MSA authority in accordance with MSA regulations. FFI's fishing rights were summarily and punitively restricted and diminished by Congress pursuant to the Coast Guard Act. Unlike the statute in <u>American Pelagic</u>, which was a facially general change to a regulatory scheme but in reality applied to only one vessel, the Coast Guard Act facially targets and impacts only three vessels and one company, while leaving the other four Amendment 80 companies not only intact but advantaged because the rights taken from FFI effectively go over to them. FFI has not been injured by a general change to the regulatory regime, but by a very specific taking of valuable fishing rights and transfer of that property to its competitors.

Plaintiffs also state that "[t]he Coast Guard Act's creation of a 'class of one' has no relation to the uniform modifications permitted under the MSA, and violates the fundamental fairness principles at the heart of the Takings Clause." (citing <u>Kirby Forest Indus., Inc. v. United States</u>, 467 U.S. 1, 14 (1984)). Finally, with respect to the <u>Penn Central</u> factors, plaintiffs disagree with defendant that they have not sufficiently alleged a non-categorical regulatory takings.

Regarding defendant's motion to dismiss, when examining what must be pled in order to state a claim, a plaintiff need only state in the complaint "a short and plain

24

statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(2); see also Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The United States Supreme Court has stated:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, [Conley v. Gibson, 355 U.S. 41, 47 (1957)]; Sanjuan v. American Bd. of Psychiatry and Neurology, Inc., 40 F.3d 247, 251 (7th Cir. 1994), a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, see Papasan v. Allain, 478 U.S. 265, 286 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level, see 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-36 (3d ed. 2004) (hereinafter Wright & Miller) ("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"), on the assumption that all the allegations in the complaint are true (even if doubtful in fact), see, e.g., Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508, n.1 (2002); Neitzke v. Williams, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely") . . . . [W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.

Bell Atl. Corp. v. Twombly, 550 U.S. at 555-56, 570 (footnote and other citations omitted; omissions in original); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555-57, 570); First Mortg. Corp. v. United States, 961 F.3d 1331, 1339 (Fed. Cir. 2020); Am. Bankers Ass'n v. United States, 932 F.3d 1375, 1380 (Fed. Cir. 2019); Frankel v. United States, 842 F.3d 1246, 1249 (Fed. Cir. 2016); A&D Auto Sales, Inc. v. United States, 748 F.3d 1142, 1157 (Fed. Cir. 2014); Bell/Heery v. United States, 739 F.3d 1324, 1330 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2014); Kam-Almaz v. United States, 682 F.3d 1364, 1367 (Fed. Cir. 2012) ("The facts as alleged 'must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).'" (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 557)); Totes-Isotoner Corp. v. United States, 594 F.3d 1346, 1354-55 (Fed. Cir.), cert. denied, 562 U.S. 830 (2010); Bank of Guam v. United States, 578 F.3d 1318, 1326 (Fed. Cir.) ("In order to avoid dismissal for failure to state a claim, the complaint must allege facts 'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief." (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 557)), reh'g and reh'g en banc denied (Fed. Cir. 2009), cert. denied, 561 U.S. 1006 (2010); Cambridge v. United States, 558 F.3d 1331, 1335 (Fed. Cir. 2009) ("[A] plaintiff must plead factual allegations that support a facially 'plausible' claim to relief in

order to avoid dismissal for failure to state a claim." (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)); Cary v. United States, 552 F.3d 1373, 1376 (Fed. Cir.) ("The factual allegations must be enough to raise a right to relief above the speculative level. This does not require the plaintiff to set out in detail the facts upon which the claim is based, but enough facts to state a claim to relief that is plausible on its face." (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555, 570)), reh'g denied (Fed. Cir.), cert. denied, 557 U.S. 937 (2009); Christen v. United States, 133 Fed. Cl. 226, 229 (2017); Christian v. United States, 131 Fed. Cl. 134, 144 (2017); Vargas v. United States, 114 Fed. Cl. 226, 232 (2014); Fredericksburg Non-Profit Hous. Corp. v. United States, 113 Fed. Cl. 244, 253 (2013), aff'd, 579 F. App'x 1004 (Fed. Cir. 2014); Peninsula Grp. Capital Corp. v. United States, 93 Fed. Cl. 720, 726-27 (2010), appeal dismissed, 454 F. App'x 900 (Fed. Cir. 2011); Legal Aid Soc'y of N.Y. v. United States, 92 Fed. Cl. 285, 292, 298 n.14 (2010).

When deciding a case based on a failure to state a claim, the court "must accept as true the factual allegations in the complaint." Engage Learning, Inc. v. Salazar, 660 F.3d 1346, 1355 (Fed. Cir. 2011); see also Erickson v. Pardus, 551 U.S. 89, 94 (2007) ("In addition, when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555-56 (citing Swierkiewicz v. Sorema N. A., 534 U.S. at 508 n.1))); Scheuer v. Rhodes, 416 U.S. at 236 ("Moreover, it is well established that, in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader."), abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982), recognized by Davis v. Scherer, 468 U.S. 183, 190 (1984); Am. Bankers Ass'n v. United States, 932 F.3d at 1380 ("In reviewing a motion to dismiss, we accept as true the complaint's well-pled factual allegations; however, we are not required to accept the asserted legal conclusions." (citing Ashcroft v. Iqbal, 556 U.S. at 678)); Harris v. United States, 868 F.3d 1376, 1379 (Fed. Cir. 2017) (citing Call Henry, Inc. v. United States, 855 F.3d 1348, 1354 (Fed. Cir. 2017)); United Pac. Ins. Co. v. United States, 464 F.3d 1325, 1327-28 (Fed. Cir. 2006); Samish Indian Nation v. United States, 419 F.3d 1355, 1364 (Fed. Cir. 2005); Boise Cascade Corp. v. United States, 296 F.3d 1339, 1343 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2002), cert. denied, 538 U.S. 906 (2003).

The Takings Clause of the Fifth Amendment to the United States Constitution provides in pertinent part: "nor shall private property be taken for public use without just compensation." U.S. Const. amend. V. The purpose of this Fifth Amendment provision is to prevent the government from "'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" Ark. Game & Fish Comm'n v. United States, 568 U.S. 23, 31 (2018) (quoting Armstrong v. United States, 364 U.S. 40, 49 (1960)); see also Palazzolo v. Rhode Island, 533 U.S. 606, 618 (2001) (quoting Armstrong v. United States, 364 U.S. at 49), abrogated on other grounds by Lingle v. Chevron U.S.A. Inc., 544 U.S. 528 (2005), recognized by Hageland Aviation Servs., Inc. v. Harms, 210 P.3d 444 (Alaska 2009)); Penn Cent. Transp. Co. v. City of New York, 438 U.S. at 123-24; Lingle v. Chevron U.S.A. Inc., 544 U.S. at 536; E. Enters. v. Apfel, 524 U.S. 498, 522 (1998); Pumpelly v. Green Bay & Miss. Canal Co., 80 U.S.

(13 Wall.) 166, 179 (1871) (citing principles which establish that "private property may be taken for public uses when public necessity or utility requires" and that there is a "clear principle of natural equity that the individual whose property is thus sacrificed must be indemnified"); Reoforce, Inc. v. United States, 853 F.3d 1249, 1265 (Fed. Cir. 2017), cert. denied, 138 S. Ct. 517 (2017); Rose Acre Farm, Inc. v. United States, 559 F.3d at 1266; Janowsky v. United States, 133 F.3d 888, 892 (Fed. Cir. 1998); Res. Invs., Inc. v. United States, 85 Fed. Cl. 447, 469-70 (2009).

   "[A] claim for just compensation under the Takings Clause must be brought to the Court of Federal Claims in the first instance, unless Congress has withdrawn the Tucker Act grant of jurisdiction in the relevant statute." E. Enters. v. Apfel, 524 U.S. at 520 (citing Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1016-19 (1984)); see also Jan's Helicopter Serv., Inc. v. F.A.A., 525 F.3d 1299, 1304–05 (Fed. Cir. 2008); Acceptance Ins. Cos. v. United States, 503 F.3d 1328, 1336 (Fed. Cir. 2007); Morris v. United States, 392 F.3d 1372, 1375 (Fed. Cir. 2004) ("Absent an express statutory grant of jurisdiction to the contrary, the Tucker Act provides the Court of Federal Claims exclusive jurisdiction over takings claims for amounts greater than $10,000."); Altair Global Credit Opportunities Fund (A), L.L.C. v. United States, 138 Fed. Cl. 742, 754 (2018) (quoting E. Enters. v. Apfel, 524 U.S. at 520). The United States Supreme Court has declared: "If there is a taking, the claim is 'founded upon the Constitution' and within the jurisdiction of the [United States Court of Federal Claims] to hear and determine." Preseault v. Interstate Commerce Comm'n, 494 U.S. 1, 12 (1990) (quoting United States v. Causby, 328 U.S. 256, 267 (1946)); see also Lion Raisins, Inc. v. United States, 416 F.3d 1356, 1368 (Fed. Cir. 2005); Narramore v. United States, 960 F.2d 1048, 1052 (Fed. Cir. 1992); Hardy v. United States, 127 Fed. Cl. 1, 7 (2016); Perry v. United States, 28 Fed. Cl. 82, 84 (1993).

   To succeed under the Fifth Amendment Takings Clause, a plaintiff must show that the government took a private property interest for public use without just compensation. See Dimare Fresh, Inc. v. United States, 808 F.3d 1301, 1306 (Fed. Cir. 2015) (stating that the "'classic taking'" is one in which the government directly appropriates private property for its own use (quoting Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 324 (2002)), cert. denied, 136 S. Ct. 2461 (2016); Adams v. United States, 391 F.3d 1212, 1218 (Fed. Cir. 2004), cert. denied, 546 U.S. 811 (2005); Arbelaez v. United States, 94 Fed. Cl. 753, 762 (2010); Gahagan v. United States, 72 Fed. Cl. 157, 162 (2006). The government must be operating in its sovereign rather than in its proprietary capacity when it initiates a taking. See St. Christopher Assocs., L.P. v. United States, 511 F.3d 1376, 1385 (Fed. Cir. 2008).

   "The issue of whether a taking has occurred is a question of law based on factual underpinnings." Huntleigh USA Corp. v. United States, 525 F.3d 1370, 1377-78 (Fed. Cir.), cert. denied, 555 U.S. 1045 (2008). "[M]ost takings claims turn on situation-specific factual inquiries." Ark. Game & Fish Comm'n v. United States, 568 U.S. at 32 (citing Penn Cent. Transp. Co. v. City of New York, 438 U.S. at 124); see also Moden v. United States, 404 F.3d 1335, 1342 (Fed. Cir. 2005) (finding that summary judgment "should not be granted precipitously" "due to the fact-intensive nature of takings cases" (citing Yuba Goldfields, Inc. v. United States, 723 F.2d 884, 887 (Fed. Cir. 1983))); In re Upstream

Addicks & Barker (Texas) Flood-Control Reservoirs, 138 Fed. Cl. 658, 664 (2018) (stating that courts tend to be slow to dismiss takings claims, preferring to first develop a factual record (quoting Moden v. United States, 404 F.3d at 1342; and Ark. Game & Fish Comm'n v. United States, 568 U.S. at 29)).

The United States Court of Appeals for the Federal Circuit has established a two-part test to determine whether government actions amount to a taking of private property under the Fifth Amendment. See Casitas Mun. Water Dist. v. United States, 708 F.3d 1340, 1348 (Fed. Cir. 2013); Klamath Irr. Dist. v. United States, 635 F.3d 505, 511 (Fed. Cir. 2011); Am. Pelagic Fishing Co. v. United States, 379 F.3d 1363, 1372 (Fed. Cir.) (citing M & J Coal Co. v. United States, 47 F.3d 1148, 1153-54 (Fed. Cir.), cert. denied, 516 U.S. 808 (1995)) reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1139 (2005); see also United Affiliates Corp. v. United States, 143 Fed. Cl. 257, 262 (2019) ("A takings claim is evaluated under a two-part analysis." (citing Acceptance Ins. Cos. v. United States, 583 F.3d 849, 854 (Fed. Cir. 2009))). A court first determines whether a plaintiff possesses a cognizable property interest in the subject of the alleged takings. See Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435 (1982) (citing United States v. Gen. Motors Corp., 323 U.S. 373 (1945)); see also Sharifi v. United States, 987 F.3d 1063, 1068 (Fed. Cir. 2021) ("To claim a Fifth Amendment taking, a plaintiff must show a 'cognizable property interest.'" (quoting Alimanestianu v. United States, 888 F.3d 1374, 1380 (Fed. Cir. 2018), cert. denied, 139 S. Ct. 1164 (2019)); Love Terminal Partners, L.P. v. United States, 889 F.3d 1331, 1339 (Fed. Cir. 2018) ("As a threshold matter, 'the existence of a valid property interest is necessary in all takings claims.'" (quoting Wyatt v. United States, 271 F.3d 1090, 1097 (Fed. Cir. 2001)), cert. denied, 139 S. Ct. 2744 (2019); Welty v. United States, 926 F.3d 1319, 1323-24 (Fed. Cir. 2019) ("To maintain a cognizable claim for a Fifth Amendment taking, a plaintiff must establish that he possessed an enforceable property right." (citing Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1014-19 (1992))); Reid v. United States, 143 Fed. Cl. 661, 668 (2019) (finding that "[i]n takings matters, a protectable property interest must be a 'legally-recognized property interest such as one in real estate, personal property, or intellectual property'" (quoting Adams v. United States, 391 F.3d 1212, 1224 (Fed. Cir. 2004))); Piszel v. United States, 833 F.3d 1366, 1374 (Fed. Cir. 2016), cert. denied, 138 S. Ct. 85 (2017); Rogers v. United States, 814 F.3d 1299, 1303 (Fed. Cir. 2015); Casitas Mun. Water Dist. v. United States, 708 F.3d at 1348; CRV Enters., Inc. v. United States, 626 F.3d 1241, 1249 (Fed. Cir. 2010), cert. denied, 563 U.S. 989 (2011); Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1372 ("'It is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation.'" (quoting Wyatt v. United States, 271 F.3d 1090, 1096 (Fed. Cir. 2001), cert. denied, 353 U.S. 1077 (2002); and citing Cavin v. United States, 956 F.2d 1131, 1134 (Fed. Cir. 1992))); Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206, 1213 (Fed. Cir.) (stating that the court does not address the second step "without first identifying a cognizable property interest" (citing Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1381; and Conti v. United States, 291 F.3d at 1340)), reh'g denied and reh'g en banc denied (Fed. Cir. 2005); Karuk Tribe of Cal. v. Ammon, 209 F.3d 1366, 1374-75 (Fed. Cir.), reh'g denied and en banc suggestion denied (Fed. Cir. 2000), cert. denied, 532 U.S. 941 (2001); Christy, Inc. v. United States, 141 Fed. Cl. 641, 657 (2019) (holding that "[t]o prevail on a takings claim,

a plaintiff must 'identify[ ] a valid property interest' under the Fifth Amendment" (citations omitted)); <u>Jackson v. United States</u>, 135 Fed. Cl. 436, 444 (2017) (citation omitted); <u>Balagna v. United States</u>, 135 Fed. Cl. 16, 22 (2017), <u>recons. denied</u>, No. 14-21L, 2017 WL 5952123 (Fed. Cl. Dec. 1, 2017). "If the claimant fails to demonstrate the existence of a legally cognizable property interest, the courts [sic] task is at an end." <u>Am. Pelagic Fishing Co. v. United States</u>, 379 F.3d at 1372 (citing <u>Maritrans Inc. v. United States</u>, 342 F.3d 1344, 1352 (Fed. Cir. 2003); and <u>M & J Coal Co. v. United States</u>, 47 F.3d at 1154); <u>see also Hearts Bluff Game Ranch, Inc. v. United States</u>, 669 F.3d 1326, 1329 (Fed. Cir. 2012) (citing <u>Am. Pelagic Fishing Co. v. United States</u>, 379 F.3d at 1372), <u>cert. denied</u>, 567 U.S. 917 (2012). Only if there is to be a next step, "'after having identified a valid property interest, the court must determine whether the governmental action at issue amounted to a compensable taking of that property interest.'" <u>Huntleigh USA Corp. v. United States</u>, 525 F.3d at 1378 (quoting <u>Am. Pelagic Fishing Co. v. United States</u>, 379 F.3d at 1372); <u>see also Love Terminal Partners, L.P. v. United States</u>, 889 F.3d at 1339 (citing <u>First English Evangelical Lutheran Church of Glendale v. Los Angeles County, California</u>, 482 U.S. 304, 315 (1987)); <u>Casitas Mun. Water Dist. v. United States</u>, 708 F.3d at 1348. Then, the court must determine whether the government action is a "'compensable taking of that property interest.'" <u>Huntleigh USA Corp. v. United States</u>, 525 F.3d at 1377 (quoting <u>Am. Pelagic Fishing Co. v. United States</u>, 379 F.3d at 1372).

As discussed above, two cases which are of significant importance to determine whether plaintiffs in the above-captioned case have suffered a compensable taking of (1) their physical property, (i.e., vessels), and (2) the licenses and permits referenced in the amended complaint, are <u>Conti</u> and <u>American Pelagic</u>, as both cases were decided by the United States Court of Appeals for the Federal Circuit and in both certiorari was denied by the United States Supreme Court, and are precedential for this court. Those two cases, like the one currently before the court, involved, and denied, alleged regulatory takings of the plaintiffs' fishing vessels and fishing permits governed by the Magnuson-Stevens Act and its implementing regulations. Following the analytical sequence used by the Federal Circuit in both <u>Conti</u> and <u>American Pelagic</u>, this court analyzes whether FFI has a cognizable property interest in its fishing licenses and permits, and then analyzes whether FFI can allege that a compensable, non-categorical regulatory taking of its vessels had occurred as a result of the limitations imposed on a specific use of its vessels by section 836 of the Coast Guard Act, namely, the harvesting and processing of groundfish for itself and third-party vessels.

<u>Cognizable Property Interest in FFI's Licenses and Permits</u>

The <u>Conti v. United States</u> case involved a swordfisherman, Paul Conti, who alleged that a "1999 prohibition on drift gillnet swordfishing in the Atlantic Swordfish Fishery had deprived him of all economic value in his swordfishing permit, his vessel, the *F/V Providenza* (owned by Conti Corporation), and his swordfishing gear." <u>Conti v. United States</u>, 291 F.3d at 1335. The <u>Conti</u> court explained that "[i]n short, Mr. Conti contends that, while he still is in possession of his permit, the *Providenza*, and his gear, there has been taken from him the ability to use those things in a particular way: to fish for swordfish in the Atlantic Swordfish Fishery using drift gillnets." <u>Id.</u> at 1340. Having determined "the

precise nature of the taking claim that Mr. Conti is asserting," and addressing first his swordfishing permit, the <u>Conti</u> court turned to an analysis of the first part of the "two-part test to evaluate claims that a governmental regulation constitutes a taking of private property without just compensation," which was "whether the claimant has established a 'property interest'" for purposes of the Fifth Amendment.'" <u>See id.</u> (quoting <u>M & J Coal Co. v. United States</u>, 47 F.3d at 1154). The <u>Conti</u> court explained that "[t]he Constitution neither creates nor defines the scope of property interests compensable under the Fifth Amendment," and that "[i]nstead, 'existing rules and understandings' and 'background principles' derived from an independent source, such as state, federal, or common law, define the dimensions of the requisite property rights for purposes of establishing a cognizable taking." <u>Id.</u> (citing <u>Bd. of Regents of State Colleges v. Roth</u>, 408 U.S. 564, 577 (1972); and quoting <u>Lucas v. S.C. Coastal Council</u>, 505 U.S. at 1019. The <u>Conti</u> court further explained that "[a]pplying these principles, courts have held that no property rights are created in permits and licenses." (citing <u>United States v. Fuller</u>, 409 U.S. 488, 493 (1973); and <u>Alves v. United States</u>, 133 F.3d 1454, 1457 (Fed. Cir. 1998)). The <u>Conti</u> court, guided by the United States Supreme Court's focus on the revocability of the permits at issue in <u>Fuller</u>, as well as express statutory and regulatory language governing the <u>Fuller</u> permits, found that Mr. Conti's swordfishing permit "falls short of conferring a cognizable property interest." <u>Conti v. United States</u>, 291 F.3d at 1341. The <u>Conti</u> court reasoned:

> As noted above, the Department of Commerce required that Mr. Conti obtain a permit to harvest swordfish in the Atlantic Swordfish Fishery in the exercise of its authority under the MSA. <u>See</u> 16 U.S.C. § 1811; <u>Atlantic Swordfish Fishery</u>, 50 Fed. Reg. at 33,957. While Mr. Conti could and did utilize his permit to fish for more than a decade, he could not assign, sell, or otherwise transfer the permit. <u>Atlantic Swordfish Fishery</u> 50 Fed. Reg. at 33, 957. The rights to sell, assign, or otherwise transfer are traditional hallmarks of property. <u>See</u> <u>Loretto v. Teleprompter Manhattan CATV Corp.</u>, 458 U.S. 419, 435–36, 102 S. Ct. 3164, 73 L. Ed. 2d 868 (1982) (describing rights to dispose of property and to sell it as part of an individual's bundle of property rights). Further, since the swordfishing permit did not confer exclusive fishing privileges, permit holders like Mr. Conti lacked the authority to exclude others from the Atlantic Swordfish Fishery. <u>See</u> <u>Dolan v. City of Tigard</u>, 512 U.S. 374, 384, 114 S. Ct. 2309, 129 L. Ed. 2d. 304 (1994) (the "right to exclude others is 'one of the most essential sticks in the bundle of rights that are commonly characterized as property.'" (quoting <u>Kaiser Aetna v. United Sates</u>, 444 U.S. 164, 176, 100 S. Ct. 383, 62 L. Ed. 2d 332 (1979). In addition, the government at all times retained the right to revoke, suspend, or modify the permit. <u>See</u> 50 C.F.R. § 635.4(a)(3) (2000). Finally, the M.S.A. § itself states that the limited access authorization system "shall not create any right, title, or interest in or to any fish," and that the Department of Commerce may adopt regulations that limit or terminate a particular permit system "without compensation to holders of any limited access system permits." 16 U.S.C. § 1853(d)(3)(D), (d)(2)(A).

The absence of crucial indicia of a property right, coupled with the government's irrefutable retention of the right to suspend, revoke, or modify Mr. Conti's swordfishing permit, compels the conclusion that the permit bestowed a revocable license, instead of a property right. See 50 C.F.R. § 635.4. A contrary holding, as the Supreme Court recognized in Fuller, counterintuitively would compensate a claimant for "the value of a right that the Government . . . can grant or withhold as it chooses." Fuller, 409 U.S. at 493, 93 S. Ct. 801 (quoting United States v. Rands, 389 U.S. 121, 125, 88 S. Ct. 265, 19 L. Ed. 2d 329 (1967)).

Conti v. United States, 291 F.3d at 1341–42 (footnotes omitted; ellipsis in original).

In American Pelagic, the case concerned the plaintiff's commercial fishing of mackerel and herring in the Northeast area of the EEZ, which fisheries also were governed by the Magnuson-Stevens Act and its implementing regulations. See Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1366–67. As explained by the Federal Circuit in American Pelagic:

In November 1996, Atlantic Star Fishing Company, American Pelagic's predecessor, purchased a large, U.S.-flagged hull with the intent of transforming it into a commercial fishing vessel. In January 1997, it contracted with a Norwegian shipyard to convert the hull into a freezer trawler—a large, commercial fishing vessel with the capacity to catch all of its own fish, freeze them on board, and offload them for shipping to their final destination. The result was the *Atlantic Star*, a vessel 369 feet long, displacing 6,900 gross tons, and having a total of 13,400 horsepower (about 7,000 horsepower for running the generators for the freezers and the remainder for propulsion. Outfitted with the most sophisticated technology for locating, sorting, and freezing fish year-round, the *Atlantic Star* could safely hold 400 to 500 metric tons of fish. American Pelagic's total investment in the vessel approached $40 million.

While the vessel was being outfitted, American Pelagic set about applying for the necessary permits and gear authorizations. Pursuant to 50 C.F.R. § 648.4(a)(5) (1996), the *Atlantic Star* was required to carry on board a valid Atlantic mackerel permit to fish for, possess, or land Atlantic Mackerel in or from the EEZ. Because of the potential for incidental bycatch, the *Atlantic Star* also was required to have a Northeast Multispecies (Nonregulated) fish permit. Id. § 648.4(a)(1). In April 1997, the Northeast Regional Office of the NMFS reissued both permits to American Pelagic: Federal Fisheries Permit # 610018 for, inter alia, Atlantic Mackerel, expiring December 31, 1997; and Federal Fisheries Permit # 610018 for Northeast Multispecies (Nonregulated), expiring April 30, 1998. In addition, pursuant to 50 C.F.R. § 648.80(d) (1996), on August 28, 1997, the Northeast Regional Office issued to American Pelagic a Gulf of Maine/Georges Bank Midwater Trawl

Gear Authorization letter for, inter alia, Atlantic herring, expiring April 30, 1998.

Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1367–68 (footnotes and citations to the trial court cases omitted). Despite efforts to prepare the *Atlantic Star* to begin commercial fishing in the Northeast mackerel and herring fisheries, according to the American Pelagic court, "opposition to the *Atlantic Star* began to develop." Id. at 1368. Ultimately, as stated by the American Pelagic court:

> Congress passed a rider to an appropriations act that effectively cancelled American Pelagic's existing permits and authorization letter, and at the same time prevented any further permits from being issued to the *Atlantic Star*. The following year, Congress enacted the identical provision in another appropriations act, and in 1999, it made the size limitation and permit revocation permanent. The NMFS has since promulgated regulations reflecting this prohibition. As a result of the legislation, the *Atlantic Star* was unable to receive a permit to fish in any U.S. fishery within the EEZ; at the time, no other vessel was affected by the legislation.

Id. (footnotes omitted) (citing Am. Pelagic Fishing Co. v. United States, 49 Fed. Cl. 36, 41 (2001) (American Pelagic I), rev'd and remanded, 379 F.3d 1363 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1139 (2005); Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1998, Pub. L. No. 105–119, § 616, 111 Stat. 2440, 2518–19 (1997); Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1999, Pub. L. No. 105–277, tit. I, § 202, 112 Stat. 2681, 2681–718 (1998); 1999 Emergency Supplemental Appropriations Act, Pub. L. 106–31, § 3025, 113 Stat. 57, 100–101 (1999)). The American Pelagic court further explained that after a few subsequent, unprofitable attempts to repurpose the *Atlantic Star*, American Pelagic brought suit in the United States Court of Federal Claims in March 1999, "alleging that the 1997 and 1998 Appropriations Acts revoking its permits and barring it from receiving future permits effected a temporary taking of the *Atlantic Star*." Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1369. In July 1999, "American Pelagic sold the *Atlantic Star* to two of its partners." Id. The Federal Circuit further explained that "in its complaint, American Pelagic asserted that it had a property right in its fishery permits and authorizations that was taken by the legislation," as well as "asserted that the United States had 'taken, destroyed, and deprived [American Pelagic] of its compensable, investment backed expectations in the use and operation of the [*Atlantic Star*]' and had 'taken all economically viable use' of the vessel." Id. Addressing, first, plaintiff's cognizable property interests in its "fishery permits," i.e., the FFPs discussed above, "and authorization letter," the Federal Circuit in American Pelagic stated:

> We conclude that American Pelagic did not and could not possess a property interest in its fishery permits and authorization letter. In Conti, we explained that because he could not assign, sell, or transfer his swordfishing permit, because it did not confer exclusive fishing privileges, and because

the government at all times retained the right to revoke, suspend, or modify it, Paul Conti did not possess a property interest in his permit. 291 F.3d at 1341–42. This "absence of crucial indicia of a property right, coupled with the government's irrefutable retention of the right to suspend, revoke, or modify" the swordfishing permit "compels the conclusion that the permit bestowed a revocable license, instead of a property right." Id. at 1342. The same reasoning extends to American Pelagic's permits and authorization letter. There is simply no contention that American Pelagic had the authority to assign, sell, or transfer its permits and authorization letter, nor that it was granted exclusive privileges to fish for Atlantic mackerel and herring in the EEZ. American Pelagic distinguishes its permits from Mr. Conti's only by alleging that the government could not refuse to issue or reissue, revoke, modify, or suspend them in the absence of specified conditions. As the government notes, however, the regulation upon which American Pelagic relies specifically provides that "Nothing in this subpart precludes sanction or denial of a permit for reasons not relating to enforcement." 15 C.F.R. § 904.301(a). This language preserved the government's right to deny or sanction the permits and authorization letter issued to the Atlantic Star. The conditions we set forth in Conti are therefore met. We agree with the Court of Federal Claims that American Pelagic did not possess a property interest in its fishing permits and authorization letter.

Am. Pelagic Co. v. United States, 379 F.3d at 1375 (footnote omitted).

Like the plaintiffs in Conti and American Pelagic, plaintiffs in the above-captioned case also have alleged a taking of their fishing licenses and permits, namely, the Federal Fisheries Permits (FFP), License Limitation Program (LLP) licenses, and Amendment 80 Quota Share (QS) permits they had received. As an initial matter, the court notes that plaintiffs, in their response to defendant's motion to dismiss, largely focus on the LLP license and the Amendment 80 QS permit, to the exclusion of the FFP, as meeting the indicia to establish a cognizable property interest. Even if plaintiffs had attempted to put forth argument with respect to the FFP, alleging a cognizable property interest in the FFP is precluded by the Federal Circuit's holding in American Pelagic. As discussed above, the American Pelagic court squarely held that American Pelagic "did not and could not possess a property interest in its fishery permits," which included American Pelagic's FFPs, because, among other reasons, the FFP could not be transferred, and could be revoked by the government at any time. See Am. Pelagic Co. v. United States, 379 F.3d at 1374.

Plaintiffs attempt to distinguish their LLP licenses and the Amendment 80 QS permits from the permits at issue in Conti and American Pelagic by focusing on certain aspects of their transferability and exclusivity. Unlike the permits in Conti and American Pelagic, the LLP license and the Amendment 80 QS permit can be transferred, but only under specifically outlined conditions, including approval by NMFS, as dictated in 50 C.F.R. § 679.4(k)(7)(i)–(ix) (transfers of LLP licenses), and 50 C.F.R. § 679.90(e) (transfers of Amendment 80 QS permits). With respect to exclusivity, plaintiffs' LLP

licenses in the current case under consideration, on their own, do not allow the plaintiffs to exclude others from the ability harvest or process groundfish. Instead, as explained earlier in this Opinion, the License Limitation Program limits the number of participants eligible to compete in the "race for fish," based on a number of conditions, including participation history in a specific groundfish, vessel size, and gear used, and anyone who meets the criteria is eligible for an LLP groundfish license. See generally 50 C.F.R. § 679.4(k); 63 Fed. Reg. at 52,642 ("The LLP limits the number, size, and specific operation of vessels that may be deployed in the groundfish fisheries in the exclusive economic zone (EEZ) off Alaska."). In addition, and contrary to plaintiffs' contention, the Amendment 80 QS permit also does not confer exclusive fishing privileges to its holders. As explained in the preamble to the Amendment 80 final rule:

> Amendment 80 QS holders that do not join an Amendment 80 cooperative can participate in the Amendment 80 limited access fishery. The Program will assign to the Amendment 80 limited access fishery the amount of the Amendment 80 sector's allocation of Amendment 80 species ITAC . . . that remains after allocation to all of the Amendment 80 cooperatives. Participants fishing in the Amendment 80 limited access fishery will continue to compete with each other; will not realize the same potential benefits from consolidation and coordination; and will not receive an exclusive harvest privilege that accrues to members of an Amendment 80 cooperative. NMFS will manage the Amendment 80 limited access fishery similar to the way the fisheries were managed prior to implementation of the program.

72 Fed. Reg. at 52,672 (capitalization in original). Therefore, only if an Amendment 80 QS permit holder joins a cooperative, and receives a cooperative quota (CQ) permit, does the cooperative, not an individual such as FFI, have the ability to exclude others not part of the cooperative from the combined quota share allocated to the cooperative. See 50 C.F.R. § 679.4(o)(2)(ii) ("A CQ permit authorizes an Amendment 80 cooperative to catch a quantity of fish expressed as a portion of the ITAC . . . that may be held for exclusive use by that Amendment 80 cooperative."). Without holding a CQ permit, however, an Amendment 80 QS permit holder must compete with other non-CQ-permit-holding Amendment 80 QS holders for the six Amendment 80 groundfish discussed earlier in this Opinion. Plaintiffs in the above-captioned case do not allege a takings of an Amendment 80 CQ permit.

Moreover, and notwithstanding the highly regulated conditions of transferability and lack of exclusivity of the LLP license and the Amendment 80 QS permit, as the Conti court observed, the Magnuson-Stevens Act "itself states that the limited access authorization system 'shall not create any right, title, or interest in or to any fish.'" Conti v. United States, 291 F.3d at 1341 (quoting provision of the Magnuson-Stevens Act now codified at 16 U.S.C. § 1853a(b)). Indeed, as discussed earlier in this Opinion, the Magnuson-Stevens Act at 16 U.S.C. § 1853a(b) states, in full:

**(b) No creation of right, title, or interest**

Limited access privilege, quota share, or other limited access system authorization established, implemented, or managed under this chapter—

> (1) shall be considered a permit for the purposes of sections 1857, 1858, and 1859 of this title;
>
> (2) may be revoked, limited, or modified at any time in accordance with this chapter, including revocation if the system is found to have jeopardized the sustainability of the stock or the safety of fishermen;
>
> (3) shall not confer any right of compensation to the holder of such limited access privilege, quota share, or other such limited access system authorization if it is revoked, limited, or modified;
>
> (4) shall not create, or be construed to create, any right, title, or interest in or to any fish before the fish is harvested by the holder; and
>
> (5) shall be considered a grant of permission to the holder of the limited access privilege or quota share to engage in activities permitted by such limited access privilege or quota share.

Id. (emphasis in original). Furthermore, consistent with the above-expressed congressional intent not to confer any right, title, or interest, and to preserve the government's authority to revoke the privileges enjoyed in a limited access privilege or quota share, the regulations implemented by NMFS with respect to all of the permits addressed in Part 679, including the FFP, the LLP license, and the Amendment 80 QS permit, state:

> (8) Harvesting privilege. Quota shares, permits, or licenses issued pursuant to this part are neither a right to the resource nor any interest that is subject to the "takings" provision of the Fifth Amendment to the U.S. Constitution. Rather, such quota shares, permits, or licenses represent only a harvesting privilege that may be revoked or amended subject to the requirements of the Magnuson-Stevens Act and other applicable law.

50 C.F.R. § 679.4(a)(8); License Limitation Program, 63 Fed. Reg. at 52,654.

Therefore, under the analysis set forth in Conti and American Pelagic, which asks the court to consider "traditional notions of property and existing rules and understandings" in the context of permits and licenses arising out of the Magnuson-

Stevens Act, plaintiffs have not, and cannot, allege a cognizable property interest in their FFPs, LLP licenses and Amendment 80 QS permits. See, e.g., Conti, 291 F.3d at 1341–42. These rules and understandings include (1) the express congressional intent not to confer property rights pursuant to a limited access privilege, and to preserve the government's authority to revoke a fishery participants' privileges at any time; (2) the accompanying regulations which explicitly preclude the FFP, LLP license, and Amendment 80 QS from being the subject of a Fifth amendment takings; and (3) the highly regulated and limited conditions under which plaintiffs can transfer, or exclude others, to the extent that it can transfer or exclude, at all. In addition, to the extent that plaintiffs attempt to argue that the "class of one" nature of the restrictions imposed by section 836 of the Coast Guard Act, is somehow relevant in determining the existence of a cognizable property interest in its various fishing licenses and permits, the court finds such an argument not persuasive. As discussed above, the "Coast Guard Act Sideboards" in section 836 of the Coast Guard Act limit plaintiffs' ability harvest and process in a number of groundfish fisheries, but do not limit any other participants in those fisheries. See Coast Guard Act, § 836(a), 132 Stat. at 4320–21. As explained by the Conti court, however, "it is his [Mr. Conti's] relationship with the asserted permit—not the government's—that determines whether a property right exists." Conti v. United States, 291 F.3d at 1341 (alteration added). The court also notes that in American Pelagic, in which the restrictions, similar to the effect of the "Coast Guard Act Sideboards" in the above-captioned case, operated to single out plaintiffs' property and fishing permits, the American Pelagic court did not afford any weight to a similar argument when determining whether the plaintiff could establish a cognizable property interest in its fishing permits.

Although plaintiffs attempt to characterize their fishing licenses and permits as "appurtenances" to its vessels, and otherwise attempt to invoke maritime law, in neither Conti nor American Pelagic, did the Federal Circuit mention that the established principles of maritime law had a role in determining whether a cognizable property interest could be established in the permits at issue in those cases, even though both cases could have involved maritime law to the same extent as the above-captioned case. See generally Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1373–74 (acknowledging plaintiff's argument that it "had a property right in its 'lawfully duly issued fishery permits and authorizations' that was 'appurtenant to the use and operation of [American Pelagic's] fishing vessel," but not referring to maritime law in its analysis (alterations in original) (quoting American Pelagic plaintiff's complaint)); Conti v. United States, 291 F.3d at 1340–42. Both cases solely focused on relevant provisions of the Magnuson-Stevens Act and its implementing regulations. Therefore, although some of the licenses and permits at issue in the above-captioned case may have some limited characteristics of transferability and exclusivity, the totality of the circumstances, which include the government's express intent to retain the authority to revoke the licenses and permits at any time, and that the licenses and permits cannot be the subject of a Fifth Amendment takings, plaintiffs have not alleged a cognizable property interest in their various licenses and permits.

Regulatory Taking of FFI's Asserted Right to Use its Vessels for Harvesting and Processing Groundfish

After finding in Conti and American Pelagic that the plaintiffs did not have cognizable property interests in their fishing permits, the United States Court of Appeals for the Federal Circuit in both cases turned next to address whether regulatory takings had occurred of the respective plaintiffs' vessels, and other physical property, as a result of the regulatory restrictions affecting their fishing activities. Ultimately, the Federal Circuit concluded in both cases that a Fifth Amendment takings of plaintiffs' asserted rights to use their property for commercial fishing, had not occurred. See Conti v. United States, 291 F.3d at 1343–45 ("We are unable to accept Mr. Conti's argument that the limitation on the use of his property [the *F/V Providenza* and swordfishing gear] that was imposed by the ban on drift gillnet fishing resulted in a taking of that property."); Am. Pelagic v. United States, 379 F.3d at 1376 ("American Pelagic did not have, as one of the sticks in the bundle of property rights that it acquired with title to the *Atlantic Star*, the right to fish for Atlantic mackerel and herring in the EEZ.").

In Conti, the Federal Circuit relied on a comparison of the impact of the drift gillnet ban on Mr. Conti's vessels and gear, to the impact of the regulations which restricted the appellees in the Supreme Court case, Andrus v. Allard, 444 U.S. 51 (1979). The Andrus case, as explained by the Conti court, involved regulations pursuant to the Eagle Protection Act and Migratory Bird Treaty Act providing "that migratory birds and eagles, and their parts, that were lawfully acquired prior to the effective dates of the statutes could be possessed and transported without a federal permit, but that such birds and their parts could not be purchased, sold, or traded, or offered for purchase, sale, or trade." See Conti v. United States, 291 F.3d at 1343–44 (citing Andrus v. Allard, 444 U.S. at 51; 16 U.S.C. §§ 668(a), 703; 50 C.F.R. §§ 212.2(a) (1978), 22.2(a) (1978)). The appellees in Andrus, who were "engaged in the trade of Indian artifacts," a number of which artifacts "were partly composed of the feathers of birds protected by the statutes and regulations," and which were in the possession of the appellees prior to when the "statutory protections came into force," "argued that the prohibition on commercial transactions in pre-existing avian artifacts embodied in the regulations constituted a taking of their property under the Fifth Amendment because the prohibition wholly deprived them of the opportunity to earn a profit from the artifacts." See Conti v. United States, 291 F.3d at 1344 (citing Andrus v. Allard, 444 U.S. at 54). As quoted by the Conti court, the Supreme Court in Andrus determined that a taking of the appellees' property had not occurred:

> "The regulations challenged here do not compel the surrender of the artifacts, and there is no physical invasion or restraint upon them. Rather a significant restriction has been imposed on one means of disposing of the artifacts. But the denial of one traditional property right does not always amount to a taking. At least where an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety. In this case, it is crucial that appellees retain the rights to possess and transport their property, and to donate or devise the protected birds.

> It is, to be sure, undeniable that the regulations here prevent the most profitable use of appellees' property. Again, however, that is not dispositive. When we review regulation, a reduction in the value of property is not necessarily equated with a taking."

Conti v. United States, 291 F.3d at 1344 (quoting Andrus v. Allard, 444 U.S. at 65–66). Relying on the above analysis in Andrus, the Conti court determined that a taking did not occur with respect to Mr. Conti's property, stating:

> Andrus compels our rejection of Mr. Conti's claim that the ban on drift gillnet fishing resulted in a taking of the *Providenza* and its gear. We accept as true all of the factual allegations in Mr. Conti's complaint. The problem is that those allegations make out less of a taking claim than the allegations that were advanced in support of the taking claim that was rejected in Andrus. Following the ban on drift gillnet fishing, Mr. Conti is in a far better situation vis-a-vis his vessel and its gear than the appellees in Andrus were vis-à-vis their artifacts in the wake of the Eagle Protection Act and Migratory Bird Treaty Act regulations. Most importantly, Mr. Conti can offer for sale, and can sell, his property, whereas the appellees in Andrus could do neither. We are sympathetic to the situation in which Mr. Conti finds himself following the ban on drift gillnet fishing in the Atlantic Swordfish Fishery. However, as a matter of law, we are unable to hold that, on the alleged facts, he has asserted a cognizable taking claim.

Conti v. United States, 291 F.3d at 1344–45. In addition, in a footnote, the Conti court stated that "Mr. Conti's taking claim fails for an additional reason." Id. at 1345 n.8. The Federal Circuit explained:

> Mr. Conti's ability to use his vessel and gear to catch swordfish using drift gillnets in the Atlantic Swordfish Fishery was dependent upon a permit that was revocable at all times and that, as we have seen, did not constitute a property right for purposes of the Fifth Amendment. In Mitchell Arms, Inc. v. United States, 7 F.3d 212, 217 (Fed. Cir. 1993), we rejected the claim that the Bureau of Alcohol, Tobacco, and Firearms' decision to revoke a permit allowing the importation and sale of certain firearms constituted a taking of the claimant's right to use the permit for those purposes. We stated: "Mitchell's ability to import the rifles and sell them in the United States was at all times entirely subject to the exercise of ATF's regulatory power. Consequently, any expectation which arose on Mitchell's part as a result of the import permits did not constitute a property right protected by the Fifth Amendment." Id. at 217. Likewise, the drift gillnet regulation at issue here has banned a particular use of Mr. Conti's vessel and gear "which was not inherent in its ownership" and was "totally dependent upon the . . . permit issued by" the government. Id.

Conti v. United States, 291 F.3d at 1345 n.8 (ellipsis in original).

In American Pelagic, the Federal Circuit took a slightly different approach than that which it took in Conti when determining that regulations prohibiting the American Pelagic's *Atlantic Star* from participating in the mackerel and herring Northeast fisheries did not constitute a taking of a property right inherent in the ownership of the *Atlantic Star*. See generally Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1376–83. Focusing on the history and enactment of the Magnuson-Stevens Act, the American Pelagic court explained that "[t]he various provisions of the Magnuson Act are consistent with this exercise of U.S. sovereignty over the EEZ and the fish and resources within it." Id. at 1378. The American Pelagic court further stated that the Magnuson-Stevens Act, which was "[e]nacted to 'take immediate action to conserve and manage the fishery resources found off the coast of the United States,'" "established national standards by which fishery 'conservation and management' plans would be developed," and conferred "direct authority" to the Regional Fishery Management Councils "over the fisheries within their respective geographic regions," including the "preparing and submitting" of Fishery Management Plans. See id. at 1378–79 (citing 16 U.S.C. §§ 1801(b)(1), 1851(a), 1852). The American Pelagic court also stated:

> Significantly, the Magnuson Act bars foreign fishing in the EEZ entirely, except as the United States permits, [16 U.S.C.] § 1821, and authorizes the regional councils to require federal permits for U.S. fishermen to fish in any fishery within the EEZ, id. § 1853(b)(1). Thus, in addition to asserting U.S. sovereignty over the EEZ and the fish and resources therein, Congress also erected an elaborate framework by which the fisheries in the EEZ would be managed under the oversight of the Secretary.

> Pursuant to the Magnuson Act, the "conservation and management of the EEZ" belongs to the sovereign, and this necessarily includes the right to fish in the zone. Moreover, there is no language in the statute to the effect that any fishing privileges that are granted pursuant to the Magnuson Act vest in their owners a property right protected by the Fifth Amendment.

Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1379 (quoting Foss v. Nat'l Marine Fisheries Serv., 161 F.3d 584, 588 (9th Cir. 1998) ("[T]he language of the Magnuson Act does not confer any claim of entitlement or property rights."); and Parravano v. Babbitt, 861 F. Supp. 914, 928 (N.D. Cal. 1994) ("Thus, the Magnuson Act confers on the Secretary of Commerce authority to manage the fishery resources in the EEZ for conservation. It does not confer on commercial fishermen any right or title to the fishery resources under the Department of Commerce's authority."), aff'd, 70 F.3d 539 (9th Cir. 1995), cert. denied, 518 U.S. 1016 (1996)). Furthermore, the American Pelagic court stated:

> Because it was already in place by the time American Pelagic purchased the *Atlantic Star*, the Magnuson Act was an "existing rule" or "background principle [ ]" of federal law that inhered in American Pelagic's title to the

vessel. <u>Lucas</u>, 505 U.S. at 1029–30, 112 S. Ct. 2886. In the words of the Supreme Court, as far as ownership of the *Atlantic Star* was concerned, the sovereign rights of the United States in the EEZ "inhere[d] in the title itself, in the restrictions that background principles of the [federal government's] law . . . already place[d] upon . . . ownership. <u>Id.</u> at 1029, 112 S. Ct. 2886 (discussing restrictions on real property). It was against this framework of existing federal restrictions on fishing in the EEZ that American Pelagic invested in the *Atlantic Star*. As of 1996, when the *Atlantic Star* was purchased, the Magnuson Act and the attendant regulatory scheme precluded any permitted fisherman from possessing a property right in his vessel to fish in the EEZ. The revocation of American Pelagic's permits, therefore, did not "go [ ] beyond what the relevant background principles would dictate." <u>Id.</u> at 1030, 112 S. Ct. 2886.

<u>Am. Pelagic Fishing Co. v. United States</u>, 379 F.3d at 1379 (alteration and ellipses in original). The <u>American Pelagic</u> court also stated, "we conclude that the Magnuson Act directly assumes for the federal government sovereignty over the right to fish for Atlantic mackerel and herring in the EEZ," as the Magnuson-Stevens Act "expressly asserts the United States' 'sovereign rights for the purposes of exploring, exploiting, conserving, and managing all fish' within the EEZ," and "the statute does not explicitly, or implicitly, preserve any potentially pre-existing common law right to fish in the EEZ." <u>Id.</u> (quoting 16 U.S.C. § 1801(b)(1)). Ultimately, the <u>American Pelagic</u> court found that "<u>Mitchell Arms</u> and <u>Conti</u> control this case," and stated:

> What allegedly was taken in <u>Mitchell Arms</u> was the right to import firearms and sell them in domestic commerce. What allegedly was taken in <u>Conti</u> was the right to harvest swordfish in the Atlantic Swordfish fishery using drift gillnets. In each case, the takings claim failed because what allegedly was taken was not one of the sticks in the bundle of rights that inhered in ownership of the underlying *res*: in <u>Mitchell Arms</u>, certain firearms; in <u>Conti</u>, a fishing vessel. American Pelagic is in the same situation as the plaintiffs in <u>Mitchell Arms</u> and <u>Conti</u>. As discussed above, because the Magnuson Act assumed sovereignty for the United States over the management and conservation of the resources located in the EEZ, and specifically over fishery resources, American Pelagic did not have, as one of the sticks in the bundle of property rights that it acquired with title to the *Atlantic Star*, the right to fish for Atlantic mackerel and herring in the EEZ. American Pelagic thus did not possess the property right that it asserts formed the basis for its takings claim. In the absence of that property right, its claim is fatally defective.

<u>Am. Pelagic Fishing Co. v. United States</u>, 379 F.3d at 1382–83.

The holdings in <u>American Pelagic</u> and <u>Conti</u> are binding precedent on this court and apply to the FFI case currently before the court regarding FFI's asserted right to harvest and process groundfish in the North Pacific fisheries of the EEZ, as these cases

hold that such an asserted right is not one of the "sticks" in the "bundle of property rights" when taking title to vessels for the purpose of commercial fishing in the EEZ. Therefore, when plaintiffs took title to the newly commissioned catcher/processor vessel, *America's Finest*, or title to the *Defender LLP*, or even its existing vessels, *U.S. Intrepid* and *American No. 1*, inherent in those titles was, and currently is, an understanding that the United States has sovereignty over the "management and conservation of the resources located in the EEZ, and specifically over fishery resources." See Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1383. Therefore, when section 836 of the Coast Guard Act was enacted and limited the extent to which plaintiffs' vessels could harvest and process groundfish in the North Pacific of the EEZ, what was limited was not a right to which plaintiffs are able to assert a taking. The Magnuson-Stevens Act, and its implementing regulations, as determined by the United States Court of Appeals for the Federal Circuit, was an "'existing rule' or 'background principle [ ]' of federal law that inhered in" FFI's title to their property. See Am. Pelagic Fishing Co. v. United States, 379 F.3d at 1380 (alteration in original) (quoting Lucas v. S.C. Coastal Council, 505 U.S. at 1029–30). Therefore, for the purposes of analyzing plaintiffs alleged takings, it does not matter that the limitation came by way of Congressional enactment, as opposed to a regulation promulgated by NMFS, or an amendment to the North Pacific Fishery Management Plan, nor does it matter that the limitations impacted only plaintiffs' vessels, and not all other vessels participating in the groundfish fisheries in which plaintiffs' vessels fished.

Plaintiffs allege that the limitations set forth in section 836 of the Coast Guard Act, which limitations plaintiffs refer to as the "Coast Guard Act Sideboards," and which limitations constrict, for a maximum of six years, the amount of various groundfish that FFI's vessels can harvest in the GOA, and the amount of various groundfish that FFI's vessels can process for other vessels in the GOA and BSAI, amounted to a compensable taking of plaintiffs' vessels, licenses and permits. As explained above, under the precedent set forth by the United States Court of Appeals for the Federal Circuit in American Pelagic and Conti, plaintiffs do not have a cognizable property interest in the right to conduct commercial fishing activities in any part of the EEZ, let alone the right to conduct such commercial fishing activities to its unrestricted, maximum potential effort. Unlike the plaintiffs in American Pelagic and Conti, the Coast Guard Act Sideboards do not restrict plaintiffs' ability to harvest or process fish in the North Pacific to such an extent that it cannot harvest or process fish at all. To the contrary, plaintiffs are able to conduct commercial fishing activities to the same extent they had been doing for the five years preceding the enactment of the Coast Guard Act, but cannot exceed those amounts for a maximum of six years following the enactment. See Coast Guard Act, § 836(a), 132 Stat. at 4320–21. Plaintiffs do not allege, and cannot allege, that the Coast Guard Act Sideboards have physically taken the vessels, licenses or permits, or restricted plaintiffs use of its vessels, licenses or permits to the extent that they are unusable. Indeed, plaintiffs do not allege, and cannot allege, that the Coast Guard Act Sideboards prohibit plaintiffs from selling its vessels, licenses or permits, to the extent that such licenses and permits are transferable in accordance with the Magnuson-Stevens Act. The Coast Guard Act Sideboards might have an adverse financial impact on plaintiffs, given FFI's attempt to add another vessel to its fleet, thereby increasing FFI's potential output, and the limitations also may have an adverse impact on plaintiffs' ability to market its vessels,

41

licenses and permits. Just as the <u>Conti</u> court concluded, however, that Mr. Conti's "allegations make out less of a taking claim than the allegations that were advanced in support of the taking claim that was rejected in <u>Andrus</u>," the same is true here. <u>See</u> <u>Conti v. United States</u>, 291 F.3d at 1344. The Federal Circuit in <u>Conti</u> stated that Mr. Conti, who was still able to sell his vessel and swordfishing permit, was "in a far better situation vis-a-vis his vessel and its gear than the appellees in <u>Andrus</u> were vis-à-vis their artifacts in the wake of the Eagle Protection Act and Migratory Bird Treaty Act regulations," which regulations prohibited the <u>Andrus</u> plaintiffs from selling their artifacts. <u>Id.</u> Just like Mr. Conti, FFI "can offer for sale, and can sell, his property." <u>See</u> <u>Conti v. United States</u>, 291 F.3d at 1344. Moreover, in <u>Conti</u>, after the drift gillnet restrictions, or in <u>American Pelagic</u>, after the restrictions on the *Atlantic Star*, FFI is able to remain a participant in all of the fisheries in which it had participated prior to the enactment of the Coast Guard Act Sideboards. <u>See</u> <u>Conti v. United States</u>, 291 F.3d at 1340–41,1344; <u>Am. Pelagic Fishing Co. v. United States</u>, 379 F.3d at 1369. Furthermore, the Coast Guard Act Sideboards do not restrict plaintiffs' ability in the above-captioned case to harvest the six Amendment 80 species, or any other species in the BSAI, <u>see</u> Coast Guard Act, § 836(a)(1)(A), 132 Stat. at 4320 (limiting, to historical levels, and for a maximum of six years, plaintiffs' ability to harvest GOA groundfish not subject to a Limited Access Privilege Program, but not mentioning BSAI groundfish), although the Coast Guard Act Sideboards do limit plaintiffs' ability to process GOA or BSAI groundfish for other vessels, including Amendment 80 species. <u>See</u> <u>id.</u> at § 836(a)(1)(B), 132 Stat. at 4320–21. Nevertheless, the Coast Guard Act Sideboards place FFI in a more favorable, and less restricted position with respect to its vessels, licenses and permits, than any of the plaintiffs in <u>Andrus</u>, <u>Conti</u> or <u>American Pelagic</u>.

For the reasons stated above, plaintiffs have not alleged a cognizable property interest in the licenses or permits, or in the vessels which plaintiffs alleged were taken by the Coast Guard Act Sideboards, and, therefore, plaintiffs have failed to successfully bring a takings claim in this court. FFI has failed to demonstrate the existence of a legally cognizable property interest. Defendant's motion to dismiss is **GRANTED**, and plaintiffs' complaint, therefore, is **DISMISSED**. The Clerk of the Court is instructed to enter **JUDGMENT** consistent with this Opinion.

       **IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**
